# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-KA-02165-SCT

*DEWAYNE GRAHAM a/k/a DEWAYNE*
*DAL'ANGLE GRAHAM a/k/a DEWAYNE*
*DEANGLO GRAHAM a/k/a DEWAYNE*
*DEANGELO GRAHAM*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/19/2013 |
| TRIAL JUDGE: | HON. LESTER F. WILLIAMSON, JR. |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER |
| | BY: JUSTIN TAYLOR COOK |
| | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LADONNA C. HOLLAND |
| DISTRICT ATTORNEY: | BILBO MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/25/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., KING AND COLEMAN, JJ.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1. On August 2, 2012, a Lauderdale County grand jury returned a multiple-count indictment against Dewayne Graham which alleged kidnapping, forcible rape, and sexual battery. The trial court reset the trial date five times over the next sixteen months. After a two-day trial, the jury returned a guilty verdict and the Circuit Court of Lauderdale County

sentenced him to thirty years' imprisonment in the custody of the Mississippi Department of Corrections as a habitual offender.  Aggrieved, Graham appeals.

## FACTUAL BACKGROUND

### *The Incident*

¶2.    The victim testified against Graham at trial.  According to her testimony, she became acquainted with Graham's co-aggressor, Jamonious Inge, while visiting her mother and children in December of 2011.  On December 22, 2011, she and Inge met at her mother's home.  They talked there for a period of time, until Inge offered the victim some cocaine and they went to his house.  Inge's and the victim's testimony conflict as to why they left Inge's later that evening: The victim testified that the cocaine never arrived and Inge offered her a ride back, whereas Inge testified[1] that the cocaine did arrive and, after consuming it, they went to buy cigarettes.  In either case, Graham met them outside Inge's apartment.  The three walked toward a nearby Cefco convenience store and then down a pathway behind the Cefco.

¶3.    The victim believed the car was at the other side of the trees because she "could see through the path . . . so [she thought] it[ was] just like a crossover to get somewhere, like something was on the other side."[2]  Once within the trees, Inge abruptly turned around and

----

[1] As a part of his guilty plea resulting from the incident, Inge agreed to testify against Graham.

[2] What the path was, and whether the area could really be described as "woods," re-emerges from time to time within witness testimony.  Inge said that it was "the pathway to the Winn-Dixie" from Oak Manor, the apartments in which he and the victim had been using cocaine and drinking.  Officer David Creel later testified that "the little crumple of trees [that is] not truly a wooded area" sits between the back parking lot of the Cefco and the Winn-Dixie.  Lieutenant John Griffith stated at trial that the area is "[p]robably 100 yards long and maybe five to ten yards wide" between Oak Manor and Winn-Dixie.

punched her in the eye, and then told her to pull her clothes down. The impact knocked her hairpiece from her head and one of her earrings out of its piercing.

¶4. The victim testified that she was scared, and Inge testified that he knew she didn't want to pull her pants down. The victim also testified that she was crying, that she was in shock throughout the encounter, and that Inge and Graham were "blocking [her]. . . . One was behind [her] where [she] couldn't go back through the entryway, and he was in [her] face." Both Inge[3] and the victim testified that Graham participated in the sexual assault. Graham unzipped his pants and told her to perform oral sex on him. The victim complied "because [she] was scared," but she testified that her actions were not voluntary. The victim began to talk to Inge and Graham, "saying things, just talking to try to get them to feel guilty to not do it. So [she] was just talking as much as possible so that [she] wouldn't have to do the actions."

¶5. At first, Inge attempted to penetrate the victim vaginally while standing behind her, but he was unable to achieve an erection. At that point, Graham and Inge switched positions, with Inge forcing the victim to perform oral sex while Graham forcibly raped her from behind. When Graham and Inge decided to take the victim somewhere else, she pulled her clothing into place and ran to the Cefco they had passed earlier. Inside the store, she asked the clerk to call the police and then ran behind the counter. According to the victim, Inge and Graham then entered the Cefco and began a show of concern over the victim, asking her

---

[3] Inge's testimony at trial was at points inconsistent with his statement to the police. The State presented him with that statement to refresh his recollection. His account of particular details varies but, overall, his testimony corroborates the victim's basic allegation that the two men took her into the wooded area and demanded sex from her.

3

what was wrong and who had hurt her. The clerk testified at trial that the victim looked "scared . . . nervous, upset." Detective Joe Hoadley reviewed the Cefco video footage after the incident and noted two black males having an "adversarial" confrontation with one of the females behind the counter.

¶6. Officer David Creel arrived at the Cefco after receiving a call from dispatch. The victim went to the hospital via ambulance, where a designated registered nurse performed a rape kit. The next morning, the victim visited the police station and was interviewed by Detective Hoadley.

*Procedural History*

¶7. The grand jury returned a three-count indictment on August 2, 2012. Count III of the indictment, the subject of the first part of Graham's appeal, states in pertinent part that "on or about the 23rd day of December, A.D., 2011, [Graham] did then and there wilfully, unlawfully and feloniously engage in sexual penetration, as defined in MCA Section 97-3-97 . . . by performing fellatio on [the victim]." Graham then was arraigned, and the trial court set the case for trial on October 10, 2012.

¶8. The trial court granted a total of five continuances over the next sixteen months, until trial began on December 9, 2013. The court granted the first two continuances after joint motions from the State and Graham. First, on October 10, 2012, the court granted a continuance until December 5, 2012, so that plea negotiations could continue. Second, on December 5, 2012, the court granted a continuance, though the joint motion states only "trial" as the reason for a resetting. A later continuance hearing revealed that the judge

4

granted the continuance after seeing that counsel for both parties had signed the motion. The judge at that hearing noted for the record that Graham had refused to sign the joint motion because he did not want to waive his right to a speedy trial.

¶9. Third, on February 6, 2013, the State made an *ore tenus* motion for a continuance because the victim was living in Arkansas. The State's Victim Assistance Coordinator testified at the hearing that the victim was "essentially a homeless person" and that he was having trouble locating her. Graham's counsel opposed the motion. The judge acknowledged Graham's assertion of his right to a speedy trial but still granted the continuance until April 8, 2013.

¶10. Fourth, on April 8, 2013, the State moved for another continuance because the victim had been located at an Arkansas prison, and the State was still in communication with prison authorities in an effort to move her to Mississippi for Graham's trial. The trial court granted the continuance and released Graham on a personal recognizance bond.

¶11. Fifth, on August 5, 2013, the trial court issued the final continuance, resetting the trial date for December 9, 2013. The State had moved for the continuance because of absent material State witnesses, and Graham's counsel joined the motion because she was ill and because Graham had been injured during a recent shooting.

¶12. Trial commenced on December 9, 2013. The State produced seven witnesses in the following order: Inge; the victim; Shannon Campbell, the Cefco employee who called the police; Kristen Hayes, R.N., the sexual assault nurse examiner who conducted the victim's rape kit; David Creel and John Griffith, two police officers who had been involved in the

initial response to the 911 call; and Joe Hoadley, the detective who had investigated the crime. The defense then moved for a directed verdict on Count III of the indictment, which alleged that Graham had sexually battered the victim by fellating her, arguing that there was not "a scintilla of evidence that that occurred." The State opposed the motion, and after a contentious discussion outside the presence of the jury regarding the language of the indictment, the court sided with the State and denied the motion. After the State rested, Graham produced one witness: Melvin Graham, the defendant's brother.

¶13. The jury returned guilty verdicts on all three indictments. The Circuit Court of Lauderdale County sentenced Graham to serve three concurrent sentences of thirty years' imprisonment in the custody of the Mississippi Department of Corrections as a habitual offender.

## ANALYSIS

¶14. Graham asserts four issues on appeal:

I. **Whether the trial court erred when it denied Graham's motion for a directed verdict as to Count III, when the State presented no evidence that Graham had performed fellatio on the victim.**

II. **Whether the State impermissibly amended Count III of the indictment when it issued jury instruction S-3.**

III. **Whether the State presented insufficient evidence to convict Graham.**

IV. **Whether Graham's speedy trial rights were violated when the court reset the date of trial five times over sixteen months.**

All four issues are without merit, as discussed below.

I. **The trial court did not err when it denied a motion for a directed**

6

**verdict as to Count III of the indictment because Graham was sufficiently on notice regarding the nature of the charge against him.**

¶15. "This Court reviews a trial court's grant or denial of a motion for a directed verdict *de novo*." **Solanki v. Ervin**, 21 So. 3d 552, 556 (¶ 8) (Miss. 2009). "Requests for a directed verdict and motions [for] JNOV implicate the sufficiency of the evidence." **Franklin v. State**, 676 So. 2d 287, 288 (Miss. 1996). When reviewing the sufficiency of the evidence, the Court does not ask itself whether "the evidence at trial established guilt beyond a reasonable doubt," but asks instead "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." **Bush v. State**, 895 So. 2d 836, 843 (¶ 16) (Miss. 2005) (quoting **Jackson v. Virginia**, 443 U.S. 307, 315; 99 S. Ct. 3781; 61 L. Ed. 2d 560 (1979)) (internal citations omitted). If facts and inferences considered by the Court "point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty," the Court must reverse and render. **Bush**, 895 So. 2d at 843 (citing **Edwards v. State**, 469 So. 2d 68, 70 (1985)) (internal citations omitted).

¶16. Graham argues that the trial court should have granted his motion for a directed verdict on Count III of the indictment because the State did not present sufficient evidence to satisfy the elements of the offense. However, we hold that the State provided Graham with sufficient notice of the charges against him when the indictment charged him with sexual battery by engaging in sexual penetration involving the act of fellatio.

7

¶17. Count III of the indictment states that, on or about December 23, 2011, the defendant Graham

> did then and there wilfully, unlawfully and feloniously engage in sexual penetration, as defined in MCA Section 97-3-97, with [the victim.] a female person, without her consent, *by performing fellatio on [the victim]*, . . . [i]n violation of Section 97-3-95 . . . and against the peace and dignity of the State of Mississippi.

(Emphasis added.) Graham states that dictionaries define fellatio as oral stimulation of the penis, and therefore the plain reading of the indictment requires the victim to have a penis. A review of the testimony offered at trial makes it clear that the State intended to prove that Graham forced the victim to perform fellatio upon him.

¶18. Both Inge and the victim testified that, during the assault, Graham had forced the victim to perform oral sex. At the end of the State's case, defense counsel moved for a directed verdict on Count III, stating to the court that "[the victim] testified that [Graham] didn't perform fellatio on her which obviously would make sense because she doesn't have a penis." The State responded that the act of "performing" fellatio can be either the action of fellatio or the receiving of fellatio, because "it requires two people to do that unless you've got somebody with a very limber back."

¶19. Counsel argued back and forth about which definition was correct, and the trial court decided to deny the motion for a directed verdict:

> I think . . . a jury issue is made as to whether Mr. Graham was involved in an act of fellatio involving [the victim] as set out in the indictment. I think he knew that that was what was charged. He certainly knew essentially what fellatio is and as – and sexual penetration involved his penis and her mouth, and I think that the indictment is sufficient for that purpose.

8

The trial court did not err in its decision and the typographical error in the indictment does not vitiate Graham's conviction.

¶20.    Rule 7.06 of the Uniform Rules of Circuit and County Court Practice states that an indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged and shall fully notify the defendant of the nature and cause of the accusation."  An indictment that contains the essential elements of the charges against the defendant sufficiently places the defendant on notice of the nature of the charges against him.  *Morgan v. State*, 741 So. 2d 246, 251 (¶ 11) (Miss. 1999).  Further, regarding the question of who had to have fellated whom, the Court has clarified that "[w]hether there was penetration 'of' or penetration 'with' [the victim] is not an essential element of the crime [of sexual battery] and is not relevant."  *Hennington v. State*, 702 So. 2d 403, 408 (¶ 20) (Miss. 1997).

¶21.    In *Hennington*, the indictment had charged Hennington with engaging in "sexual penetration *of* A.R., . . . by then and there . . . putting his mouth and hands on the penis of the said A.R." in violation of Mississippi law.  *Id.* at 407 (¶ 12) (emphasis in original).  Mississippi Code Section 97-3-95 uses the word "with," not "of," and so Hennington moved for a directed verdict at trial.  Further, because Hennington had fellated A.R., and not the other way around, Hennington argued on appeal that "the State did not meet its burden of proof that A.R. was penetrated by the act of fellatio.  *Id.*  We did not agree, holding that "[w]hile it is true that the indictment did not use the exact language of the statute, the essential elements for the crime of sexual battery were contained in the indictment," and that

9

the State had proven the elements beyond a reasonable doubt. *Id.* at 408 (¶ 20).

¶22.    In *Burrows v. State*, 961 So. 2d 701 (Miss. 2007), a father appealed the denial of a directed verdict for the sexual battery of his seven-year-old daughter in violation of Mississippi Code Section 97-3-95.  The indictment alleged that he had digitally penetrated the child's vagina, but the child's testimony at trial was ambiguous at best regarding whether vaginal penetration in fact had occurred. *Id.* at 704-05 (¶¶ 7, 10).  However, the child had testified without the same ambiguity that her father had inserted his penis into her anus, and that he had used a vibrator to molest her further. *Id.* at 704 (¶ 7).  We affirmed the father's conviction, holding that "[t]he variance between the language of the indictment . . . and the proof present at trial was not a fatal error" because the indictment gave Burrows "sufficient notice that he was being charged with the crime of sexual battery." *Id.* at 706 (¶ 14).  The alteration had not affected Burrows's defense, which was that the assault did not occur at all and that the child's mother had fabricated the whole story. *Id.* at 706 (¶¶ 14-15).  Because his defense would have been the same even if the indictment had tracked the proof adduced at trial, the variation between the two was "immaterial." *Id.* at 706 (¶ 16).

¶23.    Graham now finds himself in a similar situation.  The indictment stated that Graham had been charged with violating Sections 97-3-97 and 97-3-95 of the Mississippi Code.  Section 97-3-95 alerted Graham that he had been charged with sexual battery ("sexual penetration with another person without his or her consent") and Section 97-3-97 further defined "penetration" for Graham's defense preparations.  Though the language of the indictment does not precisely track the evidence produced at trial, the difference did not

10

affect his defense strategy of consent.  The Court of Appeals handled a similar case in

*Faulkner v. State*, 109 So. 3d 142 (Miss. Ct. App. 2013).  Therein, the indictment charged

the defendant, David R. Faulkner, with, *inter alia*, violating Mississippi Code Section 97-1-6

by directing a minor child to commit sexual battery upon another minor child.  *Id.* at 146 (¶

11).  The indictment charged "forced fellatio between the two children – specifically, that

Faulkner had directed A.F. to 'put his mouth on the penis of J.P.'"  *Id.*  However, the jury

instruction given at the end of the trial allowed the jury to find Faulkner guilty if the roles

were reversed – if Faulkner had forced A.F. to put his penis in the mouth of J.P.  *Id.*

Although in the case *sub judice,* Graham's attorney objected, and in *Faulkner,* the issue was

analyzed for plain error, the following reasoning of the Court of Appeals is persuasive:

> Considering whether Faulkner's substantial rights were violated, we note not all variances between an indictment and jury instructions are fatal.  To properly categorize an instruction as error, its "variance from the language of the indictment 'must be material[.]'"  *Nix*, 8 So. 3d at 145 (¶ 16) (quoting *Williams v. State*, 445 So. 2d 798, 806 (Miss. 1984)).  While trial judges should generally strive to craft jury instructions that track the indictment's language, an instruction is not necessarily fatally defective for failure to do so if the instruction "accurately follow[s] the requisite elements of the crime." *Duplantis v. State*, 708 So. 2d 1327, 1344 (¶ 76) (Miss. 1998)).

> Count VII alleged Faulkner had directed A.F. to "put his mouth on the penis of J.P.," but the jury was instructed it could convict Faulkner on this count if it found he had directed A.F. to "put his penis in the mouth of [J.P.]" Assessing the effect of this variance on the integrity of Faulkner's trial, we point out that while the language differed, the essence of the charged offense remained unchanged, as none of the requisite elements were substantially altered.  The instruction still required the jury to find beyond a reasonable doubt that Faulkner, an adult, directed A.F., a minor, to commit sexual battery by engaging in fellatio with another child, J.P.

> At trial, both children testified that Faulkner had instructed them to place their penises in the other's mouth.  And the jury was privy to the tape and transcript

11

of Faulkner's pretrial admission that he had directed A.F. to perform fellatio on J.P. Gauging potential prejudice, we find Faulkner's defense was not hampered by the differing language in Instruction 13. Faulkner's defense did not hinge on his insistence that he merely directed A.F. to submit to fellatio with J.P. but not perform fellatio on J.P. Rather, Faulkner wholly denied any involvement in sexual acts with the children. On these facts, we are unable to say any forfeited error in the jury instruction prejudiced Faulkner's defense or otherwise affected his substantial right to a fair trial. At most, the variance was a slight flaw in the trial that did not seriously affect the public fairness of the judicial proceeding.

*Faulkner*, 109 So. 3d at 147 (¶¶ 16-18).

¶24. We hold that the trial court did not err in denying Graham's motion for a directed verdict and stating that the State had created a jury question on Count III of Graham's indictment. We further hold that rational jury members could have found the essential elements of sexual battery beyond a reasonable doubt from evidence adduced at trial.

## II. Jury instruction S-3 did not impermissibly amend Count III of the indictment.

¶25. Graham contends that the trial court constructively amended the indictment against him when it gave Jury Instruction S-3, which allowed the jury to convict upon a finding that Graham put his penis in Boyd's mouth. We pause here to note the difference between a claim of constructive amendment of an indictment on the one hand and a variance in the proof and the allegations of the indictment, which we addressed above, on the other.

> A constructive amendment of an indictment occurs when the jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged. A constructive amendment of an indictment is reversible *per se*. Reversal is automatic because the defendant may have been convicted on a ground not charged in the indictment. ***Bell v. State***, 725 So. 2d 836, 855–56 (Miss.1998) (quoting ***United States v. Adams***, 778 F. 2d 1117, 1123 (5th Cir. 1985)).

12

*Bishop v. State*, 812 So. 2d 934, 941 (¶ 25) (Miss. 2002). "Not all variances between the indictment and instructions constitute a constructive amendment. . . ." *Bell v. State*, 725 So. 2d 836, 855 (¶ 61) (Miss. 1998). The central question the Court must ask when reviewing an alleged constructive amendment is "whether the variance is such as to substantially alter the elements of proof necessary for a conviction." *Bell v. State*, 725 So. 2d 836, 855 (¶ 61) (Miss. 1998). As long as the change does not "materially alter facts which are the essence of the offense on the fact of the indictment as it originally stood or materially alter a defense to the indictment as it originally stood" in a way that would prejudice the defendant's case, then the amendment is permissible." *Miller v. State*, 740 So. 2d 858, 862 (¶ 13) (Miss. 1999) (quoting *Greenlee v. State*, 725 So. 2d 816, 819 (Miss. 1998) (internal citations omitted)). The Court also has stated that "determining whether the defendant is prejudiced by the amendment depends on whether a defense under the original indictment would be equally available under the amended indictment." *Givens v. State*, 730 So. 2d 81, 87 (¶ 20) (Miss. Ct. App. 1998) (citing *Byrd v. State*, 228 So. 2d 874, 875-76 (Miss. 1969)).

¶26.    At the close of trial, the court instructed the jury that it could find Graham guilty of sexual battery if it found beyond a reasonable doubt that Graham "did willfully, unlawfully and knowingly engage in sexual penetration, to wit: fellatio, with [the victim], a female person, without her consent, by putting his penis in her mouth." As discussed above, Count III of the indictment stated the inverse: that Graham had performed fellatio on the victim.

¶27.    Graham argues that the change was an impermissible constructive amendment of the indictment. According to Graham, because he was accused of performing fellatio on the

13

victim, but the jury was allowed to find Graham guilty of sexual battery if it found that the victim had been forced to fellate Graham, his conviction on the count should be reversed.

¶28.    Graham cites *Griffin v. State*, 584 So. 2d 1274 (Miss. 1991), in support of his argument.  Graham characterizes the amendment at issue in *Griffin* as one that changed "assault with a deadly weapon 'by shooting [the victim] in the head'" to charge "assault by using a pistol, 'a means likely to produce serious bodily harm.'"  *Id.* at 1275-76.  Graham argues that the Court had concluded that such a change was substantive in nature because it changed the charges from an actual shooting to actions that likely would produce harm.  However, the Court elaborated further than Graham proposes:  the *Griffin* Court went on in its opinion to say that, because of the indictment's rewording and the undisputed facts established at Griffin's trial, Griffin's "defense that the shooting was an accident had disappeared."  *Id.* at 1276.  Graham argues that his defense to Count III was that he did not fellate the victim, so the amendment to the indictment "all but gutted Graham's theory of defense."

¶29.    As discussed in our review of Graham's first argument, the jury instruction did not alter Graham's defense, so the alteration is immaterial.  In *Chandler v. State*, 789 So. 2d 109 (Miss. Ct. App. 2001), the defendant was charged with two counts of sexual battery, with Count II alleging digital penetration of a female child.  Count II was amended after the testimony of the child and the child's therapist that "pointed to acts of fellatio rather than digital penetration."  *Id.* at 11 (¶ 3).  Chandler appealed, claiming, like Graham, that the amendment was substantive and that it interrupted his defense strategy, "requiring him to

14

defend a broader charge of sexual penetration rather than the specific charge of digital penetration." *Id.* (¶ 5). The Court of Appeals rejected Chandler's argument, stating that Chandler's general trial strategy had been one of "general denial that Chandler had sexually abused the child in any manner" and that Chandler had not offered evidence of a defense against digital penetration in particular. *Id.*

¶30. Graham's case does differ somewhat from ***Chandler*** in that, while Chandler asserted a complete denial of all sexual contact, Graham admitted to sexual acts while arguing a general defense of consent. During opening statements, Graham's counsel told the jury that Inge and the victim had proceeded to have sex after Inge punched the victim, and "at some point, my client does join in, but it's consensual." Graham's counsel also told the jury that the victim "cries rape" after the event, and that "[Graham] had sex, but it was consensual sex, and there's nothing wrong with that." When the victim testified for the State, defense counsel indeed asked about whether Graham had performed fellatio upon her, but the remainder of the questions related to whether the sex was consensual:

> So how long before you had sex with him did you meet him? . . . So were you drug [into the woods]? . . . Were you handcuffed? Did they tie a rope around you?. . . So you went voluntarily into the woods? . . . And you admit you never said no? . . . You never said, I don't want to do this? . . . You never said, Don't rape me?

¶31. Because the amendment did not alter the factual bases of the offense charged (sexual battery via penetration without consent) and because Graham's overarching defense was one of consent, we hold that Jury Instruction S-3 did not constructively amend Count III of the indictment and that Graham was not prejudiced by the change. The instant issue is without

15

merit.

### III. The State produced sufficient evidence to convict Graham on all three counts of his indictment.

¶32. Graham argues that no reasonable jury could have convicted Graham of kidnapping or sexual battery under the evidence the State produced at trial. When the Court reviews the evidence produced at trial to determine whether the State produced legally sufficient evidence to secure a sound conviction, it must view the evidence in the light most favorable to the State and ask whether any rational juror could have found that the State had proven, beyond a reasonable doubt, each element of the crime charged. *Bush v. State*, 895 So. 2d 836, 843 (¶ 16) (Miss. 2005). "Under this inquiry, all evidence supporting the guilty verdict is accepted as true, and the State must be given the benefit of all reasonable inferences that can be drawn from the evidence." *Galloway v. State*, 122 So. 3d 614, 665 (¶ 168) (Miss. 2013).

¶33. Count I of Graham's indictment charged him with kidnapping the victim in violation of Section 97-3-53 of the Mississippi Code. As such, the State had to prove that Graham, "without lawful authority and with or without intent to secretly confine," forcibly seized and confined the victim, or inveigled or kidnapped her "with intent to cause [the victim] to be confined or imprisoned against [her] will. . . ." Miss. Code Ann. § 97-3-53 (Rev. 2014). Graham argues that, other than the punch that Inge gave to the victim, neither party did anything that could be construed as a kidnapping. Graham relies on the victim's testimony that she never fought back against him and Inge, and that she was never told she was not free to leave. However, the statute does not require that a victim must attempt to flee or that she

16

be told that she cannot leave for a kidnapping to arise.

¶34. Graham cautions, however, that if the kidnapping statute were to be interpreted so broadly, every single rape or assault allegation could be accompanied by a kidnapping charge. Because of the evidence produced at trial, we are unconvinced by Graham's parade-of-horribles argument. The victim testified that the men were blocking her exit when she realized she was in danger. According to the victim, Inge had hit her, and Inge himself testified that he did indeed punch her. Inge also testified that they were in the woods, and that the victim wasn't familiar with the area. The victim testified that she asked Inge and Graham if they would "just take [her] somewhere else where [she] could not be shaking so bad," and that Inge had told her they would not because they thought that she would run. And finally, the victim testified that as soon as Inge and Graham had backed away to fix their clothes, she had fled. The jury heard both the victim's and Inge's testimony, and we hold that a reasonable juror could have found that the evidence supported the victim's allegation of having been forcibly confined in violation of Section 97-3-53.

¶35. Graham makes a similar argument regarding his conviction for forcible intercourse and sexual battery. The State had to prove that Graham had forcible sexual intercourse with the victim to convict him of rape under Mississippi Code Section 97-3-65(4)(a)), and that he had engaged in sexual penetration of the victim without her consent to convict him of sexual battery under Mississippi Code Section 97-3-95.

¶36. To support his argument, Graham liberally cherrypicks the victim's answers to his trial counsel's very precise questions and asks the Court to ignore the rest of the testimony

17

produced at trial from multiple witnesses.

> Q: And you admit that you said things like, We could have done this in the house; isn't that right?
> A: Yes, ma'am
> Q: And admit that you never said no?
> A: I was never asked.
> Q: But you never said no?
> A: No.
> Q: You never said, I don't want to do this?
> A: No.
> Q: You never said, Don't rape me?
> A: No.

As already discussed, though, Inge admittedly had punched the victim, the victim had cried throughout the encounter, and the victim already had testified that she had told the men that they could go elsewhere because she was scared, and that she had tried to make them feel guilty in the hope they would stop the assault. Where a rape victim's testimony is uncorroborated and is not contradicted or discredited by "other credible evidence," the defendant may be found guilty of rape. *Parramore v. State*, 5 So. 3d 1074, 1077 (¶ 12) (Miss. 2009).

¶37. Here, though, the victim's testimony did not stand alone. Inge's testimony corroborated the event as the victim had described it. Further, the jury had heard the Cefco employee's testimony recounting the moments following the incident, the testimony of the registered nurse who had performed the victim's rape kit, and the testimony of three law enforcement officers involved in the case. Viewing the evidence in the light most favorable to the State and taking all of the evidence supporting the guilty verdict and the reasonable inferences flowing therefrom as true, we hold that rational jurors could have found that

Graham was guilty of sexual battery and forcible rape in violation of Sections 97-3-95 and 97-3-65(4)(a). *See* Miss. Code Ann. §§ 97-3-95, 97-3-64(4)(a) (Rev. 2014).

### IV. The sixteen-month delay between Graham's arraignment and the start of trial did not violate his right to a speedy trial.

¶38. Graham alleges that the State's repeated failure to secure the testimony of its own witnesses denied Graham's constitutional right to a speedy trial. We disagree. Further, we note that Graham argues only that the State infringed upon his constitutional right to a speedy trial. He mentions his statutory right to a speedy trial in a single footnote without further argument or citation, and so we decline to address whether the State violated that statutory right as well. *See Randolph v. State*, 852 So. 2d 547, 558-59 (¶ 33) (the Court generally does not consider an assignment of error where an appellant has failed to produce a plausible argument and supporting authority on the issue.)

¶39. "A criminal defendant's right to a speedy trial is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution." *Thomas v. State*, 48 So. 3d 460, 474 (¶ 38) (citing *Hersick v. State*, 904 So. 2d 116, 121 (¶ 3) (Miss. 2004)). The United States Supreme Court established that an appellate court must consider and balance four factors when reviewing an alleged violation of a defendant's constitutional right to a speedy trial: "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 2192, 33 L. Ed. 2d 101 (1972). The Mississippi Supreme Court has applied the balancing test to Mississippi criminal cases, asserting that no single factor "is necessary or sufficient on its own to find a deprivation of the right to a speedy trial," and that all factors "must be

19

considered alongside other relevant circumstances." *McBride v. State*, 61 So. 3d 138, 142 (¶ 5) (2011) (applying *Barker*, 407 U.S. at 533.).

¶40.    *Barker* refers to the length-of-time factor as a "triggering mechanism." *Barker*, 407 U.S. at 530. "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Id.* In Mississippi, eight months of delay presumptively prejudice the defendant, at which point the reviewing court must carry out a full *Barker* analysis. *Franklin v. State*, 136 So. 3d 1021, 1033 (¶ 44) (2014) (citing *Johnson v. State*, 68 So. 3d, 1239 1242 (¶6) (Miss 2011)).

*1.    Length of Delay*.

¶41.    In the instant case, Graham was arrested a few days after the December 22, 2011, incident. The grand jury indicted Graham on August 2, 2012. Trial commenced a further sixteen months later on December 11, 2013. The Court has held that a "delay of eight months or longer is presumptively prejudicial." *Johnson v. State*, 68 So. 3d 1239, 1242 (¶ 7) (Miss. 2011) (citing *Smith v. State*, 550 So. 2d 406, 408 (Miss. 1989)). The *Johnson* Court wrote: "[L]et us be clear[:] when the delay is presumptively prejudicial that does not mean that *actual* prejudice to the defendant exists. Rather, actual prejudice is determined at a different point in the *Barker* analysis." *Johnson*, 68 So. 3d at 1242 (¶ 7). With nearly two years passing between the date of Graham's arrest and his trial, we must examine the three remaining *Barker* factors to determine whether the State violated Graham's right to a speedy trial. Now that Graham has shown the presumption of prejudice in the delay to bring him to trial, "the burden of persuasion must shift to the State to show good reason for the delay."

20

*Franklin v. State*, 136 So. 3d 1021, 1033 (¶ 44) (Miss. 2014).

2.      *Reasons for Delay*.

¶42.    *Barker* instructs that reviewing courts should assign different weights to reasons the State assigns to justify the delay. Now that Graham has shown the presumption of prejudice in the delay to bring him to trial, "the burden of persuasion must shift to the State to show good reason for the delay." *Franklin v. State*, 136 So. 3d 1021, 1033 (¶ 44) (Miss. 2014). Deliberate attempts to delay trial should weigh heavily against the State, whereas securing a missing witness should be seen as "a valid reason" for the delay and "should serve to justify appropriate delay." *Barker*, 407 U.S. at 531. Administrative concerns, such as crowded dockets, may be considered a "neutral" reason for delay, though ultimately attributable to the State, which bears the "ultimate responsibility for such circumstances" when compared to the defendant. *Id.*

¶43.    Under the *Barker* analysis, three of the five continuances must weigh in the State's favor. The February 6, April 8, and August 5, 2013, continuances had been granted so that the State could locate and secure the victim and other material State witnesses for trial testimony. *Barker*, 407 U.S. at 531. While the State bears the burden to bring the defendant to trial, the October 10, 2012, continuance, allowing time for plea negotiations to continue, cannot be weighed against the State in a *Barker* analysis. *See Taylor v. State*, 672 So. 2d 1246, 1259 (Miss. 1996) (applying the rule that plea negotiations toll the running of the statutory 270-day speedy trial clock to a constitutional *Barker* analysis). The record does not contain a satisfactory answer to the question of why the trial court granted the December 5,

21

2012, motion for a continuance. We also note that Graham himself agreed to join the first two motions for a continuance presented to the trial court.

¶44. Reviewing the five continuances, we find that the four granted by the trial court to secure material witnesses and evidence and to continue plea negotiations constituted valid, justifiable reasons for delay, and weigh them in favor of the State. *See Barker*, 407 U.S. at 531.

3.     *Whether the Defendant Timely Asserted His Right to a Speedy Trial*.

¶45. A failure to assert his right to a speedy trial does not result in waiver of that right. However, "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Barker*, 407 U.S. at 532. In making two joint motions for continuances with the State, Graham agreed to waive his right to a speedy trial. *See Guice v. State*, 952 So. 2d 129, 142 (¶ 29) (Miss. 2007) (Defendant may forgo his right to a speedy trial if, *inter alia*, he does not object to a delay). However, Graham asserted his desire for a speedy trial in an early motion for discovery and he refused to sign the December 5, 2012, joint motion for a continuance because he did not want to waive his right to a speedy trial. At the hearings on motions for continuances, Graham's counsel stated that her client desired a speedy trial. This factor therefore weighs in Graham's favor.

4.     *Whether the Defendant was Prejudiced by the Delay*.

¶46. The United States Supreme Court identified three interests to be contemplated when evaluating prejudice to the defendant: "(I) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the

22

defense will be impaired." ***Barker***, 407 U.S. at 532. "Generally, proof of prejudice entails the loss of evidence, death of witnesses, or staleness of an investigation." ***Sharp v. State***, 786 So. 2d 372, 381 (¶ 19) (Miss. 2001).

¶47. On the hearings on the State's motions for continuances, the State demonstrated that it was making active attempts to secure the testimony of State witnesses and to obtain evidence for trial. Graham argues that the State's attempts impaired his defense because had he been granted a timely trial, the State's witnesses would have been unable to testify against him, and that the State therefore "sure[d] [sic] up its case on the back of Graham's constitutional rights." Graham's own argument is rebutted by ***Barker***, in which the Supreme Court of the United States instructed that securing absent witnesses for trial in fact justified a delay in bringing a defendant for trial. ***Barker***, 407 U.S. at 531. In trying to analogize the State's efforts to locate witnesses and coordinate with the Department of Corrections of a neighboring state with the "the inability of a defendant adequately to prepare his case," ***id.*** at 532, Graham reaches too far.

¶48. Further, after granting one of the State's motions for a continuance on April 8, 2013, the trial court acknowledged Graham's right to a speedy trial and released him from custody on his own recognizance. The record indicates that he remained out of custody until his trial began in early December 2013. Graham has failed to establish that he suffered actual prejudice from the two-year delay between his December 2011 arrest and his December 2013 trial. The factor cannot weigh in his favor.

¶49. In balancing the four ***Barker*** factors, no single factor is "either a necessary or a

23

sufficient condition to the finding of a deprivation of the right of speedy trial." ***Barker***, 407 U.S. at 533. Instead, we consider them together in "a difficult and sensitive balancing process . . . carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution." ***Id.*** After evaluating the factors as instructed and examining the record and arguments presented to us for consideration, we find that Graham's right to a speedy trial was not violated by the continuances granted by the trial court.

## CONCLUSION

¶50. Discerning no error in any of the four issues asserted by Graham on appeal, we affirm his convictions and sentences as imposed by the Circuit Court of Lauderdale County.

¶51. **COUNT I: CONVICTION OF KIDNAPPING AND SENTENCE OF THIRTY (30) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT III: CONVICTION OF SEXUAL BATTERY AND SENTENCE OF THIRTY (30) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT IV: CONVICTION OF FORCIBLE RAPE AND SENTENCE OF THIRTY (30) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. THE SENTENCES OF COUNTS I, III, AND IV ARE TO RUN CONCURRENTLY WITH EACH OTHER AND CONSECUTIVELY TO THE UNSERVED SENTENCES IN ANY PRIOR CONVICTIONS. SAID SENTENCES SHALL NOT BE REDUCED OR SUSPENDED; NOR SHALL THE APPELLANT BE ELIGIBLE FOR EARLY RELEASE, PAROLE, PROBATION OR HOUSE ARREST. UPON RELEASE, APPELLANT SHALL PAY COURT COST IN THE AMOUNT OF $420 AND AN AB FEE IN THE AMOUNTS OF $500 AND $10. ANY POSTED CASH BOND WILL BE FORFEITED AND APPLIED TO THE ABOVE REFERENCED AMOUNTS DUE. APPELLANT SHALL RECEIVE NO JAIL CREDIT.**

**WALLER, C.J., RANDOLPH, P.J., LAMAR, KING, MAXWELL AND BEAM, JJ., CONCUR. DICKINSON, P.J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION. KITCHENS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION.**

**KITCHENS, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

24

¶52. Although appalled by the heinous acts of which Graham was convicted, I am unable to join the majority's decision to affirm all three of his convictions. As the majority concedes, Count III of Graham's indictment incorrectly recited the material facts constituting the offense of sexual battery. This was a glaring error that deprived Graham of his federal and state constitutional right to notice of the crime charged, and it cannot be disregarded. Because the State failed to prove the facts actually alleged in Count III, on that count Graham was entitled to a directed verdict in his favor. Further, the trial court constructively amended Graham's indictment in violation of Uniform Rule of Circuit and County Court Practice 7.06 by granting a jury instruction that conformed to the evidence adduced at trial, rather than to the indictment. Finally, because Graham's confinement of the victim was merely incidental to his crime of forcible rape, the evidence was insufficient to support Graham's kidnapping conviction. I would reverse and render Graham's convictions of sexual battery and kidnapping. I would affirm Graham's conviction of forcible rape.

> *A. Graham was entitled to a directed verdict because the State did not prove the facts alleged in the indictment.*

¶53. The Sixth Amendment to the United States Constitution guarantees that "the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation." U.S. Const. amend. VI. Under the Mississippi Constitution, "the accused shall have a right . . . to demand the nature and cause of the accusation." Miss. Const. art 3, § 26. Uniform Rule of Circuit and County Court Practice 7.06 safeguards these constitutional protections by requiring that an indictment contain a "definite written statement of the essential facts

25

constituting the offense charged." It must fully notify the defendant of the offense charged. URCCC 7.06. "[A]n indictment must contain (1) the essential elements of the crime charged, (2) sufficient facts to fairly inform the defendant of the charge which he must defend, and (3) sufficient facts to enable him to plead double jeopardy in the event of a future prosecution for the same offense." *Young v. State*, 119 So. 3d 309, 313 (Miss. 2013). While the trial court has the power to amend an indictment as to matters of form, only the grand jury that returned the indictment may amend the indictment to change the substance of the charge. URCCC 7.09; *Spann v. State*, 771 So. 2d 883, 898 (Miss. 2000); *Quick v. State*, 569 So. 2d 1197, 1199 (Miss. 1990) (stating that "[i]t has been the law since 1858 that the court has no power to amend an indictment as to the matter of substance without the concurrence of the grand jury by whom it was found, although amendments as to mere informalities may be made by the court").

¶54.    The pertinent part of Graham's sexual battery indictment alleged that Graham "did then and there willfully, unlawfully and feloniously engage in sexual penetration, as defined in MCA Section 97-3-97, with [the victim], a female person, without her consent, *by performing fellatio on [the victim],* . . . In violation of Section 97-3-95 . . . ." (Emphasis added.) Under Mississippi Code Section 97-3-95(a), one is guilty of sexual battery if "he or she engages in sexual penetration with . . . [a]nother person without his or her consent." Miss. Code Ann. § 97-3-95(a) Rev. 2014). Mississippi Code Section 97-3-97(a) defines "sexual penetration" as "cunnilingus, fellatio, buggery or pederasty, any penetration of the genital or anal openings of another person's body by any part of a person's body, and

26

insertion of any object into the genital or anal openings of another person's body." Miss. Code. Ann. § 97-3-97(a) (Rev. 2014).

¶55. The indictment charged that Graham committed sexual battery by performing fellatio on the victim. "Fellatio" is defined as "oral stimulation of the penis." *Fellatio, Webster's Ninth New Collegiate Dictionary* 455 (1983). Because the indictment states that the victim on whom Graham performed fellatio was "a female person," it cannot be said that the indictment charged a crime. Even assuming that the indictment sufficiently charged Graham with sexual battery, the problem with Graham's sexual battery conviction is that the material facts alleged in the indictment were not what was proven at trial. The State's evidence was that Graham forced the victim to perform fellatio on him. Accordingly, after the State had rested, Graham moved for a directed verdict on the sexual battery charge, arguing that the State had failed to prove the allegations in the indictment. The State responded that "fellatio" can be either the act of receiving fellatio or performing fellatio. The trial court agreed, finding that the indictment sufficiently notified Graham that he was charged with forcing the victim to perform fellatio on him.

¶56. The trial court's reasoning was faulty. Even if the term "fellatio," by itself, might refer either to receiving or performing fellatio, the grand jury specified in the indictment that Graham *performed fellatio on the victim*. Thus, the State was required to prove that act to secure a conviction.

¶57. An accused has a federal and state constitutional right to notice of the "nature and cause of the accusation," and an indictment must contain sufficient facts to inform the

27

defendant fairly of the charge. U.S. Const. amend. VI; Miss. Const. art 3, § 26; URCCC 7.06. Constitutionally sufficient notice is not achieved by providing the accused incorrect or approximate facts. A corollary to these principles is that, if the State cannot prove the facts alleged in the indictment beyond a reasonable doubt, then the accused is entitled to a directed verdict. *Griffin v. State*, 540 So. 2d 17, 20 (Miss. 1991). Here, the State was unable to prove the facts charged in the indictment. Unless the court permissibly could have allowed amendment of the indictment to conform to the proof, Graham was entitled to a directed verdict. *See id.* As it stood, the indictment utterly deprived Graham of his state and federal constitutional rights to notice of the nature and cause of the accusation.

*B. Jury instruction S-3 constructively amended Count III of the indictment.*

¶58.   As stated, Graham's indictment charged him with performing fellatio on the victim. Over Graham's objection, the trial court instructed the jury that it could find Graham guilty of sexual battery if it found beyond a reasonable doubt that Graham "did willfully, unlawfully and knowingly engage in sexual penetration, to wit: fellatio, with [the victim], a female person, without her consent, by putting his penis in her mouth." Graham argues that, with this jury instruction, the trial court constructively and impermissibly amended the indictment.

¶59.   "A constructive amendment of the indictment occurs when the proof and instructions broaden the grounds upon which the defendant may be found guilty of the offense charged so that the defendant may be convicted without proof of the elements alleged by the grand jury in its indictment." *Bell v. State*, 725 So. 2d 836, 855 (Miss. 1998). "Amendments to an indictment are permissible if they do not prejudice the defendant by (1) materially altering

28

the essential facts of the offense *or* (2) materially altering a defense under the original indictment." ***Lee v. State***, 944 So. 2d 35, 40 (Miss. 2006) (emphasis added). Defects of substance may be corrected only by the grand jury that returned the indictment, and cannot be corrected by the trial court. ***Spann***, 771 So. 2d at 898.

¶60. It is beyond question that the jury instruction materially altered the essential facts of sexual battery as charged in the indictment. The indictment charged Graham with performing fellatio on the victim, but the trial court instructed the jury to find guilt if it determined that Graham had forced the victim to perform fellatio on him. The majority finds that, because Graham's defense of consent was not altered after the amendment, the amendment was not substantive. However, the test is not whether the defense employed by the accused is available after the amendment, but whether the amendment materially altered any defense that was available under the original indictment. ***Lee***, 944 So. 2d at 40. A defendant always has available the defense that he or she did not perform the acts alleged in the indictment. Here, the defense that Graham did not perform fellatio on the victim was no longer available to him after the amendment. Because the amendment materially altered the facts alleged in the indictment, the amendment was a matter of substance, and it could have been accomplished only by the grand jury that returned the indictment. ***Spann***, 771 So. 2d at 898.

¶61. It is not the proper role of this State's trial courts or of this Court to correct substantive errors in indictments to conform to the proof adduced at trial. In ***Stirone v. United States***, 361 U.S. 212, 213, 80 S. Ct. 270, 4 L. Ed. 2d 252 (1960), the defendant was indicted for interfering with interstate commerce in violation of the Hobbs Act by causing sand to be

29

moved into the State of Pennsylvania. The Court found that the trial court had amended the indictment by granting a jury instruction allowing the jury to find that Stirone had violated the Hobbs Act by interfering with steel shipments from Pennsylvania into other states. *Id.* at 217, 80 S. Ct. 270. The Court found that the amendment was beyond the power of the trial court to make and could have been made only by the grand jury. *Id.* The Court stated that "The grand jury which found this indictment was satisfied to charge that Stirone's conduct interfered with interstate importation of sand. But neither this nor any other court can know that the grand jury would have been willing to charge that Stirone's conduct would interfere with interstate exportation of steel . . . ." *Id.*

¶62. The facts of *Stirone* are analogous to the facts before the Court today. Here, the grand jury charged certain facts underlying Graham's sexual battery charge, but the trial court granted to the State, over defense objection, a jury instruction stating different facts. The jury instruction constructively amended the indictment in violation of Graham's constitutional rights to notice of the nature and cause of the accusation against him. We cannot know whether the grand jury would have been willing to charge Graham with the conduct set out in the jury instruction. As the Court stated in *Stirone*,

> "If it lies within the province of a court to change the charging part of an indictment to suit its own notions of what it ought to have been, or what the grand jury would probably have made it if their attention had been called to suggested changes, the great importance which the common law attaches to an indictment by a grand jury, as a prerequisite to a prisoner's trial for a crime, and without which the constitution says 'no person shall be held to answer,' may be frittered away until its value is almost destroyed.
>
> . . .

> Any other doctrine would place the rights of the citizen, which were intended to be protected by the constitutional provision, at the mercy or control of the court or prosecuting attorney . . . ."

*Id.* at 216-17, 80 S. Ct. 270 (quoting *Ex parte Bain*, 121 U.S. 1, 7 S. Ct. 781, 30 L. Ed. 849 (1887), *overruled in part on other grounds by United States v. Cotton*, 535 U.S. 62, 122 S. Ct. 1781, 152 L. Ed. 2d 860). Because the trial court constructively amended Graham's indictment, I would reverse and render his sexual battery conviction.

*C. The evidence was insufficient to support Graham's kidnapping conviction.*

¶63. Graham argues that the evidence was insufficient to support his conviction of kidnapping. He challenged the sufficiency of the evidence with his motion for a directed verdict and his request for a peremptory instruction, which were denied. "The standard of review for a trial court's denial of a motion for directed verdict, peremptory instruction or judgment notwithstanding the verdict (JNOV) is identical." *Brown v. State*, 176 So. 3d 1, 11 (Miss. 2015). These motions challenge the sufficiency of the evidence, and this Court "reviews the ruling on the last occasion the challenge was made in the trial court." *Id.* "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bush v. State*, 895 So. 2d 836, 843 (Miss. 2005) (quoting *Jackson v. Virginia*, 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). If the facts and inferences, so considered, "point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty," then we must reverse and render. *Bush*, 895 So. 2d at 843

(quoting *Edwards v. State*, 469 So. 2d 68, 70 (Miss. 1985)).

¶64. The crime of kidnapping is proscribed by Mississippi Code Section 97-3-53, which provides that:

> Any person who, without lawful authority and with or without intent to secretly confine, shall forcibly seize and confine any other person, or shall inveigle or kidnap any other person with intent to cause such person to be confined or imprisoned against his or her will, . . . upon conviction, shall be imprisoned for life in the custody of the Department of Corrections if the punishment is so fixed by the jury in its verdict. If the jury fails to agree on fixing the penalty at imprisonment for life, the court shall fix the penalty at not less than one (1) year nor more than thirty (30) years in the custody of the Department of Corrections.

Miss. Code Ann. § 97-3-53 (Rev. 2014). Graham challenges the sufficiency of the evidence that he forcibly seized and confined the victim or inveigled or kidnapped her with intent to cause her to be confined or imprisoned against her will. He argues that, if "the kidnapping statute [were] to be interpreted as broadly as it is in this case, every single rape or assault allegation could be accompanied by a kidnapping charge."

¶65. Graham essentially argues that the evidence was insufficient because it showed that his confinement of the victim was merely incidental to his sexual assault of the victim. In *Cuevas v. State*, 338 So. 2d 1236, 1238 (Miss. 1976), this Court articulated the following rule applicable to Graham's argument:

> *If forcible detention or movement is merely incidental to a lesser crime than kidnapping, such confinement or movement is insufficient to be molded into the greater crime of kidnapping.* An illustration might well be a strong-armed robbery where the victim is detained and perhaps moved a few feet while being relieved of his wallet. The detention and movement would not support kidnapping albeit with force and unlawful. On the other hand, if the confinement or asportation be not merely incidental to a lesser crime, but a constituent part of the greater crime, the fact of confinement or asportation is

sufficient to support kidnapping without regard to distance moved or time of confinement.

*Id.* (emphasis added). Like Mississippi, a majority of states have recognized that the crime of kidnapping "does not include conduct involving a restraint that is merely incidental to the commission of some other crime against the victim." **State v. Salamon**, 949 A. 2d 1092, 1119 (Conn. 2008), *overruled in part on other grounds by* **State v. Sanseverino**, 969 A.2d 710 (Conn. 2009). The reason for the rule is that "a literal reading of the kidnapping statutes can lead to overzealous enforcement, with the result that 'persons who have committed such substantive crimes as robbery or assault – which inherently involve the temporary detention or seizure of the victim – will suffer the far greater penalties prescribed by the kidnapping statutes.'" **State v. Goodhue**, 833 A. 2d 861, 864-65 (Vt. 2003).

¶66. In *Cuevas*, a prisoner escaped from a county jail and fled to an automobile agency, where he took an employee hostage and directed him at gunpoint to the agency's parts department. *Id.* at 1237. Cuevas held the employee at gunpoint in the parts department for almost two hours. *Id.* On appeal, Cuevas challenged the sufficiency of the evidence of kidnapping. *Id.* The Court held that the employee's detention was not merely incidental to some lesser crime, and that "the confinement and movement of [the employee] by force from the service entrance of the building to the parts department of the building was sufficiently proved to support Cuevas' conviction." *Id.* at 1238-39.

¶67. In *Salter v. State*, 876 So. 2d 412, 414 (Miss. Ct. App. 2003), Salter broke into a bank, waited for the employees to arrive, and then forced three employees at gunpoint into a vault, where he made them lie on the floor. He stole $37,000 from the bank and escaped by stealing

an employee's car. *Id.* Salter was convicted of burglary, two counts of armed robbery, and four counts of kidnapping. *Id.* Citing *Cuevas*, Salter argued that the kidnappings were merely incidental to the crime of armed robbery. *Id.* at 415. The Court of Appeals examined "whether Salter's actions were incidental to a lesser crime or were a constituent part of the greater crime." *Id.* The Court of Appeals held that Salter had fulfilled the elements of kidnapping by forcing the employees into the bank vault at gunpoint and shutting the door on them as he left. *Id.* In holding that Salter's actions were not merely incidental to the crime of armed robbery, the Court of Appeals noted that "Salter did not merely move the employees a few feet as he took the money." *Id.*

¶68.　In *State v. Goodhue*, the defendant, a stranger, entered the victim's home and ordered her into the bathroom. *Goodhue*, 833 A. 2d at 862. Goodhue threw the victim onto the floor, got on top of her, and then unbuttoned and unzipped her pants and tried to remove them. *Id.* A door slammed and startled Goodhue, causing him to flee the scene. *Id.* Goodhue was charged with kidnapping, attempted sexual assault, and burglary. *Id.* at 863. The trial court denied Goodhue's motion for a judgment of acquittal on the charges of attempted sexual assault and kidnapping. *Id.* On appeal, the Supreme Court of Vermont held that the evidence of attempted sexual assault was sufficient to support Goodhue's conviction. *Id.* But on the conviction of kidnapping, the Supreme Court held that:

> the movement of Carolyn from the kitchen to the bathroom floor did not exceed the confinement or removal inherent in the commission of the crime of sexual assault nor did it increase the danger to the victim over and above the danger presented by the attempted sexual assault. Defendant's actions cannot, therefore, provide the basis for a kidnapping conviction.

*Id.* at 868-69. The Vermont Supreme Court thus recognized that the confinement of the victim was merely incidental to the attempted sexual assault, and that "an offense such as rape necessarily contemplates restrictions on the victim's liberty while the crime is being committed." *Id.* at 868.

¶69.     In a case with facts similar to those *sub judice*, the Second District Court of Appeal of Florida reversed a kidnapping conviction because the movement and confinement of the victim was incidental to sexual battery. *Wilson v. State*, 159 So. 3d 316, 317 (Fla. Dist. Ct. App. 2015). The evidence showed that Wilson attacked the victim as she crossed a dimly lit vacant lot on her way home from a bar. *Id.* The vacant lot was covered with grass, underbrush, and several large trees. In the attack, Wilson grabbed the victim and they struggled. *Id.* Then, he struck her above the eye, knocked her down, and sexually assaulted her. *Id.* The victim testified that Wilson had held her against her will. *Id.*

¶70.     The appellate court reviewed three factors to determine that Wilson's conduct did not constitute kidnapping. *Id.* at 318. First, the court found that "the evidence established that the movement was merely incidental to the crime of sexual battery because it occurred during a struggle to restrain the victim by getting her to the ground." *Id.* Second, the court found that, because Wilson could not have committed the crime without restraining the victim, the confinement was inherent in the crime of sexual battery. *Id.* And third, the court found that "the movement did not have independent significance because it did not make the crime easier or substantially lessen the risk of detection." *Id.*

¶71.     In this case, the majority finds that the evidence was sufficient to support Graham's

35

kidnapping conviction. The majority rests this finding on the victim's testimony that, as Graham, his codefendant, Inge, and the victim walked along the path toward the convenience store, Inge punched the victim, and then the men blocked her exit from the wooded area as they sexually assaulted her. The majority also cites the victim's testimony that she asked Graham and Inge to take her somewhere else, that they refused, that Inge told her they would not take her elsewhere because they thought she would run, and that the victim fled at the earliest opportunity. I would find that, considering the evidence in the light most favorable to the verdict, the evidence shows that Graham's confinement of the victim was merely incidental to his crime of forcible rape.

¶72.    One commits forcible rape[4] by "hav[ing] forcible sexual intercourse with any person." Miss. Code Ann. § 97-3-65(4)(a) (Rev. 2014). Although physically restraining the victim is not a necessary element of forcible rape, *Madere v. State*, 794 So. 2d 200, 210-11 (Miss. 2001), the crime often involves physically restraining the victim in one location for its accomplishment. *See, e.g.*, *Expose v. State*, 99 So. 3d 1141, 1143 (Miss. 2012) (the rapist dragged the victim down an embankment and restrained her as she pled for him to stop). Here Graham did not move the victim, but held her in one place for the purpose of accomplishing the forcible rape. Thus, unlike in *Cuevas* and *Salter*, Graham restricted the

---

[4] *Cuevas* states that confinement or movement of a victim that is merely incidental to a "lesser crime than kidnapping" is insufficient to support a kidnapping conviction. *Cuevas*, 338 So. 2d at 1238. Because both forcible rape and kidnapping carry a maximum sentence of life imprisonment, forcible rape is not a "lesser crime than kidnapping." Miss. Code Ann. §§ 97-3-65(4)(a), 97-3-53 (Rev. 2014). But whether kidnapping is a lesser crime makes no difference to the analysis of whether conduct is merely incidental to another crime and insufficient to support a kidnapping conviction.

36

victim's movement only to the extent necessary to accomplish another crime. And as in ***Goodhue*** and ***Wilson***, Graham's confinement of the victim as he sexually assaulted her was part and parcel of his forcible rape of the victim. Considering the evidence and all reasonable inferences in the light most favorable to the State, Graham did no more than was necessary to accomplish the crime of forcible rape and his confinement of the victim was merely incidental to the forcible rape.

¶73.   The majority's holding that the evidence was sufficient to support a kidnapping conviction threatens to warrant a kidnapping conviction every time a defendant is convicted of a forcible rape that has a factual component of physical restraint. This cannot have been the legislative intent behind codifying these separate crimes. I would hold that, considering the evidence in the light most favorable to the verdict, the evidence was insufficient to support Graham's kidnapping conviction because his acts of confining the victim were merely incidental to his crime of forcible rape. I would affirm his conviction of forcible rape.

   *D. Conclusion*

¶74.   I would reverse and render Graham's convictions of sexual battery and kidnapping. Due to the fatal variance between the proof at trial and the facts alleged in the indictment, Graham was entitled to a directed verdict on the sexual battery charge. The jury instruction on sexual battery was a constructive amendment to the indictment that violated Graham's federal and state constitutional rights to notice of the nature and cause of the charge against him. And because Graham's restraint of the victim was merely incidental to his crime of forcible rape, the evidence was insufficient to support Graham's conviction of kidnapping.

37

For these reasons, I respectfully concur in part and dissent in part.