# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-01135-COA

TIMOTHY AARON DEWBERRY                                          APPELLANT

v.

STATE OF MISSISSIPPI                                              APPELLEE

DATE OF JUDGMENT:              09/19/2023
TRIAL JUDGE:                   HON. SMITH MURPHEY
COURT FROM WHICH APPEALED:     YALOBUSHA COUNTY CIRCUIT COURT,
                               SECOND JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:        OFFICE OF STATE PUBLIC DEFENDER
                               BY: MOLLIE MARIE McMILLIN
ATTORNEY FOR APPELLEE:         OFFICE OF THE ATTORNEY GENERAL
                               BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:             JAMES STEPHEN HALE JR.
NATURE OF THE CASE:            CRIMINAL - FELONY
DISPOSITION:                   AFFIRMED - 03/25/2025
MOTION FOR REHEARING FILED:

## BEFORE CARLTON, P.J., WESTBROOKS AND EMFINGER, JJ.

## CARLTON, P.J., FOR THE COURT:

¶1. Following a four-day trial, a Yalobusha County Circuit Court jury convicted Timothy Aaron Dewberry of one count of sexual battery (Count 1); one count of fondling of a child (Count 2); and one count of child exploitation (Count 3). The trial court sentenced Dewberry to serve life imprisonment for sexual battery (Count 1), fifteen years for fondling (Count 2) to be served consecutively to Count 1, and forty years for child exploitation (Count 3) to be served consecutively to Count 1 and concurrently with Count 2, all to be served in the custody of the Mississippi Department of Corrections (MDOC). Dewberry subsequently filed a motion for judgment notwithstanding the verdict (JNOV) or a new trial, which the

trial court denied.

¶2.    Dewberry appeals, asserting that (1) the trial court erred when it placed three jurors previously struck by the defense on the jury based on a *Batson*[1] challenge by the State; and (2) Jury Instruction 11 (setting forth the elements of sexual battery and defining "sexual penetration") impermissibly constructively amended the indictment.  Finding no error, we affirm Dewberry's convictions and sentences.

### STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶3.    In June 2021, a Yalobusha County grand jury indicted Dewberry for one count of sexual battery in violation of Mississippi Code Annotated section 97-3-95(1)(d) (Rev. 2020); one count of gratification of lust (fondling a child) in violation of Mississippi Code Annotated section 97-5-23 (Rev. 2020); and child exploitation in violation of Mississippi Code Annotated section 97-5-33(5) (Rev. 2020).

¶4.    Dewberry's trial took place in August 2023.  Dewberry's first assignment of error relates to the jury selection process.  To avoid repetition, we address that process below.  The State presented seven witnesses, including the victim, Amanda; Amanda's mother, Sarah; and Amanda's former stepmother, Claire.[2] The other witnesses will be identified as their testimonies are discussed.

¶5.    Sarah testified that Amanda was born in August 2011.  Dewberry is her biological father.  Sarah and Dewberry separated before Amanda was born.  Dewberry married Claire

---

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[2] The victim's name, as well as the names of her mother and former stepmother, have been changed to protect the minor child's anonymity.

in 2012. After Dewberry and Claire were married, Sarah and Claire became close friends. Amanda was allowed to spend the night with Dewberry and Claire, which began when she was about one or one-and-a-half years old. At first the visitation was just for one night every other weekend, but after Amanda turned two, she began spending two nights every other weekend with her father. Dewberry and Claire divorced in 2017. Sarah and Claire remained friends.

¶6.     Amanda was eleven years old at the time of trial. She testified that her father had sexually abused her from the time she was three years old until the time she told her mother when she was nine years old. She testified that he regularly touched "[her] middle spots," the area usually covered by her underwear, and he would put his "front spot" in her "private part." He would also call her bad names and show her inappropriate pictures and videos on his phone. Amanda also testified that when she would visit her father, he would not let her shower by herself; he showered with her. She testified that her father videoed himself sexually abusing her, and he told her he would post it. Amanda testified that another time, her father "locked [her] [in an area] under the house for three days." During that time, he gave her "some water and two apples," and "sometimes at night he would let [her] out." Amanda testified that she started trying to refuse her father's advances when she was seven years old, but when she did so, he would hit her and sometimes throw or kick her. The abuse continued until she was nine years old, when she told her mother about it.

¶7.     Sarah testified that on March 1, 2021, she and Amanda were at the Sonic Drive-In, and Amanda told her that Dewberry had been abusing her. "[Amanda] said that her dad had

3

put his middle spot to her middle spot," and her clothes were off when this happened. Sarah testified that she asked Amanda "why she hadn't told me before now. And she said that he . . . had threatened her and told her that she wouldn't be able to see him again and that he would take her away from me [(her mother)]." Amanda told her that the abuse had been happening since she was four years old.

¶8. After Amanda told Sarah about the abuse, Sarah called Claire and asked her to talk to Amanda about what she had disclosed to Sarah. Claire agreed to pick up Amanda from school the next day so that she and Amanda could talk privately. The next day, Claire explained to Amanda that Sarah had told her Amanda had something she needed to talk about, and Claire asked Amanda if she was okay with talking to her. Claire testified that Amanda then started telling her about the abuse; she (Amanda) "described things of a sexual nature that had occurred at her dad's house." Amanda's descriptions were "pretty specific[;] . . . she described both vaginal and anal penetration." Claire recorded their conversation, and this recording was admitted into evidence and published to the jury.

¶9. The day after Amanda told her mother about the abuse, they went to the police. Before she disclosed the abuse to her mother, Amanda had recorded a video about it on her tablet. Sarah gave this video to the police on that same day.

¶10. Shan Henderson was tendered and accepted as an expert in forensic interviewing and child sexual abuse. She was employed by the Family Crisis Services Children's Advocacy Center in Oxford, Mississippi (Family Crisis Services CAC). Henderson interviewed Amanda on March 12, 2021, shortly after Amanda disclosed her abuse. Her report was

4

admitted into evidence, as well as a transcript of the forensic interview. Henderson testified that Amanda described "very detailed" incidents of physical and sexual abuse, including oral, anal, and vaginal penetration. This information was also set forth in Henderson's report and the interview transcription. Henderson explained that details of this nature "would be difficult for [Amanda] to retain without repeated exposure." Amanda told Henderson that the last time the abuse happened was the week before she told her mother about the abuse.

¶11.   Molly Sullivan was tendered and accepted as an expert sexual-assault nurse examiner (SANE nurse), and her forensic consultation notes were admitted into evidence. Amanda was referred to Sullivan by the Family Crisis Services CAC. Sullivan testified that she performed a "head to toe" examination of Amanda on March 16, 2021, which was four days after Amanda's forensic interview and about a month after Amanda's last contact with her father, according to the history Sullivan had received from Amanda's mother. Sullivan testified that given this time frame, she "[did] not expect to see any acute injuries which would be active lacerations or bleeding or anything of that nature," and she did not. As Sullivan testified and as her report reflects, "It is important to remember that many forms of sexual contact do not leave physical evidence. In the rare cases where there is injury, the body is often able to heal genital injuries without scar." Sullivan also testified about "incomplete penetration" and "labial coitus," which will be further detailed below.

¶12.   Water Valley Police Chief Jason Mangrum testified that he interviewed Dewberry on March 2, 2021, the day Amanda's abuse was reported, and a second time three days later, after Henderson had conducted Amanda's forensic interview. In both interviews, Dewberry

denied having ever touched Amanda inappropriately. In his first interview, Dewberry told Chief Mangrum that he did help Amanda wash her private parts, but he would stand outside the shower and wash her hair and help bathe her. In the second interview, Dewberry said he would get in the shower with Amanda but would wear swim trunks or shorts.

¶13. Chief Mangrum also testified that based on Amanda's forensic interview, he obtained a search warrant for Dewberry's phones and electronic devices. Aaron Allen was tendered and accepted as an expert digital forensic analyst. He examined Dewberry's devices. His analysis revealed a large number of pornography files, including one photograph from Dewberry's phone of "a prepubescent female [who was] completely naked with her legs spread." He furnished the photo to Chief Mangrum, who showed it to Sarah. The child's face was not in the frame of the picture, but Sarah identified the child as Amanda from a mole on the child's thigh. Allen's analysis of Dewberry's devices also revealed that Dewberry had searched for pornographic material depicting father-daughter sexual acts.

¶14. The State rested its case-in-chief. The defense moved for a directed verdict on all three counts against Dewberry, which the trial court denied.

¶15. Dewberry called several witnesses, including his mother Vicky Dewberry and his son Chance Dewberry. Both of these witnesses testified that they never saw any physical abuse. Vicky testified that on the last weekend Amanda spent with Dewberry, she helped Amanda bathe and did not observe any marks on her, even though Amanda testified that Dewberry had thrown a tree branch at her that day. Chance testified that he was with his father on most of the weekends that Amanda visited. He never saw any physical or verbal abuse, and he had

6

never seen his father restrict Amanda's food intake.

¶16. Dewberry also testified in his own defense. He denied ever sexually or physically abusing Amanda and denied each of the charges against him. He said that he helped Amanda wash her hair in the shower, but he did not abuse her. Dewberry admitted visiting the pornography sites revealed by Allen's forensic analysis of his devices, but he said the sites were legal because they showed relations between "consenting adults." He also explained that he did take the photograph of Amanda, but he did so because she had been complaining about her "middle spot" itching. He wanted to be able to take a closer look at that area, so he took the photo. When he found nothing he thought was concerning, he deleted the photo and did not think he needed to tell Amanda's mother about it.

¶17. The defense rested, and the State finally rested. The trial court denied Dewberry's renewed motion for a directed verdict on all three counts against him.

¶18. During the jury instruction conference, the trial judge asked counsel if there were any objections to the court's jury instruction C-11, which addressed the elements of Count I (sexual battery) and also defined "sexual penetration" as "any touching or penetrating a person's anal, genital, or oral openings by the defendant . . . ." Dewberry made no objection to the instruction and agreed that it could be given. The instruction was given as Jury Instruction 11.

¶19. The jury convicted Dewberry of all three counts against him. The trial court sentenced Dewberry as set forth above. Dewberry moved for a JNOV or new trial and did not raise any arguments regarding Jury Instruction 11 in that motion. The trial court denied

Dewberry's post-trial motion. Dewberry appeals, asserting the two issues set forth above.

## DISCUSSION[3]

### I.    *Batson* Challenge

¶20.    Dewberry asserts that the trial court erred when it sustained the State's objection to Dewberry's peremptory strikes based on gender under *Batson v. Kentucky*, 476 U.S. 79 (1986), and *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) (extending the prohibition in *Batson* against racial discrimination in the use of peremptory strikes to gender-based peremptory strikes). For the reasons addressed below, we find that this assertion is without merit.

¶21.    The *Batson* decision established a three-part mechanism for determining whether a peremptory strike was discriminatory. "First, the party objecting to the use of a peremptory strike has the burden to make a prima facie case that race [or gender] was the criterion for the strike." *Miles v. State*, 346 So. 3d 840, 842 (¶4) (Miss. 2022) (quoting *H.A.S. Elec. Contractors Inc. v. Hemphill Constr. Co.*, 232 So. 3d 117, 123 (¶14) (Miss. 2016)). Under step two, "the burden shifts to the striking party to state a race-neutral reason for the strike." *Id.* Step three requires that if "the striking party offers a valid race-neutral reason, [then] the trial judge must allow the strike unless the other party demonstrates that the valid race-neutral reason was a pretext for discrimination." *H.A.S.*, 232 So. 3d at 124 (¶19). However, "[i]f . . . a trial judge properly finds the party has failed to provide a race-neutral reason [in step two], [then] the question of pretext never arises, and the juror is returned to the jury."

---

[3] The standard of review for each issue is discussed in context.

*Hardison v. State*, 94 So. 3d 1092, 1100 (¶28) (Miss. 2012).

¶22.    "[We] appl[y] a highly deferential standard of review on appeal of a trial court's *Batson* rulings." *Miles*, 346 So. 3d at 842 (¶5). "In particular, a *Batson* ruling may not be overturned unless the record indicates that the ruling was clearly erroneous or against the overwhelming weight of the evidence." *Garlington v. State*, 349 So. 3d 782, 803 (¶65) (Miss. Ct. App. 2022) (citations and internal quotation marks omitted). A reverse-*Batson* challenge is at issue here, "which is a *Batson* challenge made against the defense." *Miles*, 346 So. 3d at 842 (¶3).

¶23.    In this case, the State tendered twelve jurors to the defense. Of those twelve potential jurors, seven were female. The defense struck six of the seven females. At this point, the State made a *Batson* challenge, asserting that the defense exercised its peremptory strikes to discriminate against women on the panel. The trial court noted on the record that each of the potential jurors struck by the defense were female and found that the State made a prima facie case of discrimination.

¶24.    The trial judge then requested defense counsel to tender gender-neutral reasons for each of the peremptory strikes that were made. Rather than providing gender-neutral reasons for each specific strike, defense counsel generally stated:

> I think when this is over, it will be a better picture. This is just the way that it happened. We have notes of who we wanted and who we didn't want. It was not based on race or gender. And I think when the bigger picture is there, you'll see that we accepted females, whether they're black or white . . . . But it just so happens the way this laid out, it was not intended to be for gender purposes.
>
> . . . .

9

> [S]ome of this is a strategic thing because we have [jurors] that we're trying to get to, obviously. . . . [I]t was not—our decision was not based on race or gender.

After listening to this general explanation, the trial judge explained to defense counsel that when examining whether there was a gender-neutral reason for exercising a peremptory strike, "[W]e cannot operate in the realm of groups of 'they.' It has to be [for] a particular person." Defense counsel responded, "Well, I don't have one judge, other than . . . it's just the way of the cookie crumbling, so to speak. It was not based on race or gender."

¶25. Ultimately, defense counsel attempted to provide reasons for each of the six peremptory strikes against the female potential jurors. The trial court found that defense counsel stated gender-neutral reasons for three of the six peremptory strikes but not for the remaining three. With respect to the remaining three peremptory strikes, defense counsel offered these explanations:

| Juror 8: | Defense counsel stated that he "just didn't have a good feeling about that prospective juror." |
| Juror 25: | Defense counsel could not remember a specific reason for striking this juror. He stated, "Again, I'm just telling you that's just the way it came up." |
| Juror 33: | Defense counsel stated, "Don't have a reason for that one, Judge." |

¶26. The trial court placed potential jurors 8, 25, and 33 back on the jury, finding that the reason given for striking potential juror 8 and the lack of any specific reasons given for striking potential jurors 25 and 33 were insufficient to demonstrate a gender-neutral explanation for striking these potential jurors.

¶27.    Regarding the reason offered by defense counsel for striking juror 8—that he "did not have a good feeling about [her]"—the trial judge found that "without anything more than, quote, [not having] a good feeling, Juror No. 8 will go . . . back on the jury." We find no clear error in the trial judge's ruling. Our decision in *Murphy v. State*, 868 So. 2d 1030, 1034-35 (¶¶7-9) (Miss. Ct. App. 2003), supports this conclusion.

¶28.    In *Murphy*, the trial court found the defense's "bad feeling" about two potential jurors "was not a race[-]neutral reason and denied the [defense's] peremptory challenge." *Id.* at 1034 (¶7). We found that the trial court's findings were "not clearly erroneous," beginning our analysis by noting that "[t]he judge is in the best position to assess the overall credibility of the statements made in voir dire and by presenters of the peremptory strikes." *Id.* at 1034 (¶9). The defense "initially stated that he struck a juror 'simply because I just had a bad feeling about him[,]'" and then later said, "'His general demeanor, what we thought of him just by looking at him that we felt it would be better if we didn't have him on the jury.'" *Id.* We found that "[b]ased upon these statements made by the presenter when he supported his peremptory strike, the trial judge was not clearly erroneous when he sustained the objection to the peremptory strikes." *Id.* at 1034-35 (¶9).

¶29.    We apply the same reasoning here. Accordingly, we find no clear error in the trial court rejecting defense counsel's explanation for striking juror 8—that he did not have a "good feeling about [her]"—as a sufficient gender-neutral reason to require the State to proceed with step three under *Batson*.[4]

---

[4] The record reflects that defense counsel offered no specific gender-neutral reasons to support his peremptory strikes for jurors 25 and 33.

11

¶30. On appeal, Dewberry asserts that the general explanation the defense offered regarding its peremptory strikes for potential jurors 8, 25, and 33 encompassed sufficient gender-neutral reasons to require the trial court to proceed to step three under *Batson*. Namely, the defense told the trial court that it had "[other] witnesses that [it was] trying to get to" and striking these potential female jurors was "just the way of the cookie crumbling" or "just the way it came up." According to Dewberry, the trial court erred when it did not require the State to demonstrate that these purportedly gender-neutral reasons were a pretext for discrimination. We are not persuaded by Dewberry's assertions.

¶31. Citing *Walters v. State*, 720 So. 2d 856, 866 (¶33) (Miss. 1998), Dewberry argues that striking potential jurors to seat persons further down the prospective juror list is a valid gender-neutral reason for exercising the peremptory strikes. *Walters*, however, is wholly distinguishable and does not support Dewberry's argument here. Although the State in *Walters* explained that it struck two jurors "to get down to the next one," the relevant—and distinguishing—factor in *Walters* is that the State *also* offered specific reasons why the next potential jurors were more desirable. *Id.*

¶32. Specifically, the State struck one potential juror to get to the next person "whom the district attorney knew was a crime victim" and struck a second potential juror "so that a registered nurse could sit on the jury." *Id.* "The district attorney explained the reason for striking [the second potential juror] and seating the registered nurse was 'because of her medical credentials, because we would have a lot of pathology and a lot of odontology that I felt she would be more acceptable to in this particular case.'" *Id.* Under these

12

circumstances, the Mississippi Supreme Court found that the State's reasons for its peremptory strikes were racially neutral. *Id.*; *see also Simon v State*, 633 So. 2d 407, 411 (Miss. 1993) (finding no *Batson* violation where the trial judge found that the State offered "an acceptable race-neutral reason" for striking one potential juror where the district attorney explained it was done to get "Mr. Atwood, an *older* man, on the jury"), *vacated on other grounds*, 513 U.S. 956 (1994).

¶33.    In contrast to *Walters* and *Simon*, the defense in this case did not point to or explain why any potential juror "down the line" would be more suitable or acceptable than the females it struck. Rather, defense counsel vaguely explained that they had other jurors "they wanted to get to" and that striking the six potential female jurors "[was] just the way of the cookie crumbling, so to speak." These circumstances are akin to those in *Fields v. State*, 333 So. 3d 566 (Miss. 2021), a case in which the supreme court found "that defense counsel's explanations for striking Jurors Number[] 19 and 22 were too vague and unspecific to say that a sufficient gender-neutral reason was given to rebut a prima facie case of gender discrimination." *Id.* at 569 (¶19).

¶34.    In *Fields*, "[f]or both jurors, defense counsel told the trial court that he had them in his 'maybe' category and that he felt like 'there were some better jurors for [the defendant].'" *Id.* The supreme court contrasted this scenario with other cases in which "counsel offered a reasonably specific explanation for wanting to strike the prospective juror(s). Here, defense counsel provided no specific explanation at all for striking Jurors Number 19 and 22." *Id.* at 570 (¶23). Accordingly, the supreme court found that "defense counsel failed to

13

rebut the [State's prima facie] showing [of gender discrimination] with a gender-neutral explanation. Thus, the trial court did not err by seating Jurors Number 19 and 22." *Id.* at (¶24).

¶35.    We find that the supreme court's analysis in *Fields* applies here. As in *Fields*, the defense in this case "provided no specific explanation at all for striking" jurors 25 and 33 other than vaguely noting, "[W]e have [other jurors] that we're trying to get to." And although defense counsel did offer an additional reason with respect to juror 8—he "did not have a good feeling about [her]"—we have already rejected that explanation above. On this record, we find that "defense counsel failed to rebut the [State's prima facie] showing [of gender discrimination] with a gender-neutral explanation." *Id.* Because the defense failed to do so, "the question of pretext [under *Batson*] never arises, and the juror is returned to the jury." *Hardison*, 94 So. 3d at 1100 (¶28). For all the reasons discussed above, we find that the trial court did not err by seating jurors 8, 25, and 33 without proceeding to step three under *Batson*.

## II.    Constructive Amendment of the Indictment

¶36.    Dewberry asserts that his conviction of sexual battery should be reversed and his case remanded for a new trial because Jury Instruction 11 "constituted a constructive substantive amendment of [Count I of] the indictment," and the trial court "plainly erred" in allowing it. As further detailed below, Dewberry asserts that the definition of "sexual penetration" contained in Jury Instruction 11 was broader than the statutory definition for this term,[5]

---

[5] *See* Miss. Code Ann. § 97-3-97(a) (Rev. 2020).

14

which, according to Dewberry, "permitted the jury to convict Dewberry without proof of the elements alleged by the grand jury in the indictment [for sexual battery]."

¶37.    Dewberry acknowledges he did not raise this issue at trial,[6] and he agreed to Jury Instruction 11 as given.[7]  As such, Dewberry is "procedurally barred from raising this issue on appeal, and our review is restricted to the plain-error doctrine." *Arnold*, 393 So. 3d at 1105 (¶20) (internal quotation mark omitted).  In analyzing an issue under plain error review, "only an error so fundamental that it creates a miscarriage of justice rises to the level of plain error." *Id.* (internal quotation mark omitted).  For the reasons discussed below, we find that the trial court did not "plainly err" in giving Jury Instruction 11.  No "miscarriage of justice" occurred here.

¶38.    We recognize "that an indictment may not be amended to change the nature of the charge, except by action of the grand jury which returned the indictment." *Greenlee v. State*, 725 So. 2d 816, 821 (¶10) (Miss. 1998).  "A constructive amendment of an indictment occurs when the jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged." *Graham v. State*, 185 So. 3d 992, 1001 (¶25) (Miss. 2016) (citations omitted) (quoting *Bishop v. State*, 812 So. 2d 934, 941 (¶25) (Miss. 2002)).

---

[6] *Diming v. State*, 376 So. 3d 1231, 1245 (¶49) (Miss. Ct. App. 2023) (A defendant who fails to make a contemporaneous objection to jury instructions at trial is procedurally barred from challenging those instructions on appeal.).

[7] *Arnold v. State*, 393 So. 3d 1096, 1105 (¶20) (Miss. Ct. App. 2024) ("[W]here a party acquiesces to the giving of a jury instruction, that party is procedurally barred from later raising an error with the instruction on appeal." (internal quotation mark omitted)), *cert. denied*, 391 So. 3d 822 (Miss. 2024).

¶39.  But "[n]ot all variances between the indictment and instructions constitute a constructive amendment, nor do they rise to plain error." *Bell v. State*, 725 So. 2d 836, 855 (¶61) (Miss. 1998).  Rather, a variance "in the indictment is permissible if it does not materially alter facts which are the essence of the offense on the face of the indictment as it originally stood or materially alter a defense to the indictment as it originally stood so as to prejudice the defendant's case." *Greenlee*, 725 So. 2d at 822 (¶10) (quoting *Wilson v. State*, 574 So. 2d 1324, 1333 (Miss. 1990)).  In short, "[t]he central question is whether the variance is such as to substantially alter the elements of proof necessary for a conviction." *Bell*, 725 So. 2d at 855 (¶61).

¶40.  In this case, Count I of the indictment charged Dewberry with "engag[ing] in sexual penetration with [Amanda] . . . by placing his penis in the vagina of [Amanda]" in violation of section 97-3-95(1)(d).  Jury Instruction 11 sets forth the elements of sexual battery, including the third element that quotes this language verbatim.  The third element requires the jury to find, beyond a reasonable doubt, that "Dewberry unlawfully engaged in sexual penetration with [Amanda] by placing his penis in the vagina of [Amanda]."

¶41.  Jury Instruction 11, however, also defines "sexual penetration" as "any touching or penetrating a person's anal, genital, or oral openings by the defendant or by the defendant inserting an object into a person's anal, genital, or oral openings."  As Dewberry notes, the definition in the instruction does not track the statutory definition of "sexual penetration" under section 97-3-97(a), which provides: "'Sexual penetration' includes . . . any penetration of the genital or anal openings of another person's body by any part of a person's body, and

16

insertion of any object into the genital or anal openings of another person's body." Miss. Code Ann. § 97-3-97(a) (Rev. 2020). Dewberry argues that Jury Instruction 11 "allowed the jury to convict [him] based on an incorrect definition of sexual penetration, specifically, that sexual penetration is '*any touching* or penetrating a person's anal, genital, or oral openings.'" He asserts that this definition "broadened the definition of sexual penetration [and,] [i]n doing so, . . . lessened the State's burden and broadened the grounds for conviction, and permitted the jury to convict Dewberry without proof of the elements alleged by the grand jury in the indictment."

¶42.    We are not persuaded by Dewberry's assertions. To be sure, the definition for "sexual penetration" in the instruction is broader than the statutory definition under section 97-3-97(a).[8]   But just as we must read all jury instructions "as a whole and in context" in determining whether error has occurred, we likewise must read Jury Instruction 11 in its entirety and as a whole in making this determination. *Arnold*, 393 So. 3d at 1104 (¶18) (In determining "whether error lies in granting or refusing a jury instruction, the instructions actually given must be read as a whole and in context.").

---

[8] Use of the phrase "any touching" in the "sexual penetration" definition is erroneous but does not constitute plain error in this case, as we have detailed above. We recognize that the "sexual penetration" definition in Jury Instruction 11 is taken, verbatim, from Proposed Plain Language Model Jury Instructions (Criminal) section 2734. We discourage its use. In accordance with supreme court precedent, courts could give an instruction that "[p]enetration, however slight, is sufficient to establish the penetration element of sexual battery." *Burrows v. State*, 961 So. 2d 701, 706 (¶17) (Miss. 2007); *accord Garlington*, 349 So. 3d at 795 (¶36) (recognizing that even slight penetration of the labia, "'the fleshy folds of skin surrounding the entrance to [the victim's] vagina,' constitut[es] vaginal penetration under Mississippi law") (quoting *Walker v. State*, 262 So. 3d 560, 565 (¶12) (Miss. Ct. App. 2018)).

¶43. Read in context and as a whole, we find that the "sexual penetration" definition in the instruction did not modify the specific elements the jury was required to find to convict Dewberry of sexual battery in this case. The third element of sexual battery expressly required the jury to find beyond a reasonable doubt that "Dewberry unlawfully engaged in sexual penetration with [Amanda] *by placing his penis in the vagina of* [*Amanda*]." (Emphasis added). This language is not as broad as the definition provided. Rather, it tracks the indictment, verbatim.

¶44. As such, despite the broader definition of "sexual penetration" given, the instruction as a whole did not constructively amend Dewberry's indictment. That is, it did not "substantially alter the elements of proof necessary for a [sexual battery] conviction [in this case]," *Bell*, 725 So. 2d at 855 (¶61), nor "relieve the State of its burden to prove the essential elements of [sexual battery]," *Jenkins*, 232 So. 3d at (¶28), as alleged in the indictment.

¶45. Further, we find nothing in the record to show that the sexual penetration definition in the instruction "materially altered a defense to the indictment as it originally stood in a way that would prejudice [Dewberry's] case." *Short v. State*, 349 So. 3d 193, 196 (¶11) (Miss. Ct. App. 2022). Dewberry denied ever sexually or physically abusing Amanda, so "his defense of a general denial remained unaffected by—and equally available despite—any alleged variance between the indictment and [J]ury [I]nstruction [11]." *Id.* at 197 (¶11).

¶46. "On these facts, we are unable to say any forfeited error in the jury instruction prejudiced [Dewberry's] defense or otherwise affected his substantial right to a fair trial. At most, any variance was a slight flaw in the trial that did not seriously affect the fairness of

18

the proceeding." *Id.* Because we find no error occurred that was "so fundamental that it creates a miscarriage of justice," *Arnold*, 393 So. 3d 1105 (¶21), "we decline to find plain error." *Short*, 349 So. 3d at 197 (¶11).

¶47. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR.**