# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00225-COA

**TERRICK WRIGHT A/K/A TERRICK WRIGHT, JR. A/K/A TERRICK ARNEZ WRIGHT**    APPELLANT

v.

**STATE OF MISSISSIPPI**    APPELLEE

DATE OF JUDGMENT:    12/07/2023
TRIAL JUDGE:    HON. CAROL L. WHITE-RICHARD
COURT FROM WHICH APPEALED:    WASHINGTON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:    BRANDON ISAAC DORSEY
ATTORNEY FOR APPELLEE:    OFFICE OF THE ATTORNEY GENERAL
BY: JULIANNE KAY BAILEY
DISTRICT ATTORNEY:    WILLIE DEWAYNE RICHARDSON
NATURE OF THE CASE:    CRIMINAL - FELONY
DISPOSITION:    AFFIRMED - 01/20/2026
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., McDONALD AND LAWRENCE, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1.     A Washington County Circuit Court jury found Terrick Wright guilty of capital murder, and the trial court sentenced Wright to life in prison without eligibility for parole.[1] Wright appeals his conviction and sentence, alleging that the evidence was insufficient to support the conviction and that the court erred in denying his motion to suppress and motion in limine.  Finding no error, we affirm.

## Factual Summary

---

[1] This was Wright's second trial.  He was found guilty at his first trial, but the trial court granted him a new trial when it was discovered a juror had failed to disclose she was Facebook friends with the victim and had shared a post about the victim's death.

¶2.     On September 16, 2019, Wright's fiancée, Tymoneshia Parson, along with Wright's aunt, Annette Hoskins, applied for employment with Kingdom's Grocery in Greenville, Mississippi. The store's owners, Kevin and Joyce Kingdom, agreed to train Parson for two hours that afternoon, with Hoskins to return later in the week for training. At the end of Parson's training session, Hoskins walked into the store and said that Wright was upset with Parson. Minutes later, Wright drove up in a white cargo truck. He entered the store, visibly angry, and claimed that Parson had left their three minor children at home alone. Parson denied the accusation, insisting that Hoskins had been with the children while she was working. When the Kingdoms asked the couple to leave, Wright pushed Parson toward the door. Once outside, Wright hit Parson in her head with his fist, grabbed her by the neck, and walked her around to the passenger's side of the truck. He walked back around to the driver's side door to unlock the passenger's door, and Parson got into the truck with him. Hoskins decided to walk home.

¶3.     Approximately one hour later, Wright drove to the emergency room of Delta Regional Medical Center with an unresponsive Parson in the truck. Parson had abrasion marks on her body, and her clothes appeared torn. She was later pronounced dead. Police officers at the hospital talked with Wright and secured the vehicle.[2] A hysterical Wright told officers that the couple had had a disagreement and that Parson had tried to get out of the moving truck. Wright said that Parson then fell out, and the truck ran over her; so he stopped to pick up her

_____

[2] The truck was a rental because the couple was planning to move that weekend.

body and transport her to the hospital. Police were dispatched to the possible crime scene nearby and found a "puddle" of fresh blood near a pair of shoes. A firearm with blood on it was also found in the vehicle. A search warrant was issued for Wright's cell phone, which revealed that the couple had a volatile relationship, as it contained threatening text messages from Wright to Parson in the prior three months (e.g., "bitch u gone die" and "u really gone die hoe"). There was also a text indicating that Parson had refused to buy Wright a gun, and he replied, "Might wanna shoot u wit it."

## Procedural History

¶4. On November 12, 2020, a grand jury indicted Wright for capital murder while in the commission of a kidnapping, as defined by Mississippi Code Annotated section 97-3-53 (Rev. 2020), in violation of Mississippi Code Annotated section 97-3-19(2)(e) (Rev. 2020). As noted, Wright was found guilty at his first trial, but the court granted him a new trial, which was held on October 30, 2023, through November 1, 2023.

¶5. Officer Wendell Johnson with the Greenville Police Department (GPD) testified that on September 16, 2019, he was standing near the hospital's emergency room when a "white cargo truck" came speeding into the parking lot. Officer Johnson said that Wright "exit[ed] the driver's side of the truck asking for help." Officer Johnson went over to the passenger's side of the truck to assist Wright and saw an unresponsive Parson "in the cargo area of the truck." Her body had abrasion marks, and her clothes were "partially torn, shredded." While medical staff took Parson into the trauma area, Officer Johnson stayed with Wright, who told

3

him Parson "was apparently trying to exit the vehicle while the vehicle was moving and . . . next thing you know, . . . she was dangling from the door, apparently, the side -- the side of . . . the vehicle." At one point, Officer Johnson witnessed a "hysterical," "frustrated" Wright punch the passenger's side window, shattering the glass and injuring his fist.

¶6.    GPD Sergeant Christopher Surf, who was also present at the hospital, saw "a very large panel truck kind of like a U-Haul-type panel cargo truck come in very, very fast." Sergeant Surf said that a male (Wright) jumped out of the truck "screaming, hollering, cussing, asking for help." Observing Parson's body, the officer testified that "[s]he was completely lifeless, not breathing, unconscious, and she looked like she had a lot of injuries on her." Sergeant Surf went outside to secure the truck and could see blood "all over the driver['s] door, the – the driver['s] seat, all over the center console." Photos of the vehicle were admitted into evidence. Wright was taken to a back room, and he told officers that the couple got into an argument and that Parson "tried to jump out of the truck." Wright said that he "attempted to grab her and that's when she slipped and fell, and he felt the truck run over her." Sergeant Surf noted that Wright "was real high strung, cussing, yelling, being evasive, erratic." Upon learning that Parson was dead, Sergeant Surf said Wright "was silent at first, and then he was—he heated back up. . . . Just up and down, erratic, cussing."

¶7.    Kevin and Joyce Kingdom both testified that Parson had filled out an application for employment and had a two-hour training session with Joyce on the afternoon of September 16, 2019. Kevin stated that "right before the training" ended, Hoskins returned and "was just

4

acting a little . . . off the mark." Kevin said Hoskins informed Parson that "her boyfriend was on the way . . . and he was upset." He overheard Parson tell Hoskins "that [Hoskins] was supposed to have been there to take care – watch the kids while she was at the store training." A "white box truck" then "pulled up, and the gentleman [(Wright)] got out, came in." Wright "was real belligerent, and he was hostile toward [Parson]." According to Kevin, Wright said, "Why the 'H' you left my 'F'ing' kids at the house by theirself?" When asked how Parson reacted, Kevin opined, "I would say she was scared." Kevin instructed Wright to "calm down" and to go outside. When the couple "started to walk outside," Wright "grabbed [Parson] by the arm, shoved her out the door at that point." After the couple walked out, Kevin heard his daughter "scream," "Daddy, he hit her"; so Kevin walked to the front door where he saw Wright "dragging [Parson] around to the other side of the truck," with his hands around "[h]er shoulder and her neck." Kevin could not see the couple when they moved to the passenger's side of the truck.

¶8.     Kevin identified the surveillance video from the store, and the video was received into evidence. Kevin testified that when he viewed the video, he was able to confirm what his daughter told him, noting, "I saw [that] once he got outside[,] he hit her." The video showed Wright, Parson, and Hoskins having what appeared to be a heated discussion in the store. Once outside, Wright punched Parson in the head, causing her to bend over and put her arms around her head. Wright put his hands around her neck and walked Parson over to the passenger's door. Wright then walked back to the driver's side, and Parson got into the truck

5

a moment later.

¶9.     Joyce testified that while Wright was berating Parson, Hoskins "was just grinning." When Joyce told them to "be quiet," Wright was "very polite" and said to her, "I don't mean any harm." Joyce told him that Parson could go home and come back tomorrow, and Wright replied, "Oh, she'll be back." When Parson was "slow to move," Wright "grabbed her behind the neck and kind of pushed her on toward the door." Joyce also heard her teenage daughter cry out, "Mama, he hit her." Wright was telling Parson to get in the truck, and Joyce claimed she told Parson, "I can call the police if you would like me to." Parson declined and "finally got on in the truck."[3]

¶10.    State Medical Examiner Mark LeVaughn testified as an expert in forensic pathology. With regard to Parson's injuries, LeVaughn testified that there were "multiple abrasions or large areas of scrape marks or scratches" on her skin. He also said, "Internally, there were crushing injuries to the chest and abdomen, and, also, there were multiple areas of crushing-type fractures in her – in her body." LeVaughn testified that "there were additional injuries that were more severe than someone just exiting a vehicle and coming to rest on the side of the road." He noted "a fracture on the right, the middle, and the left side of her jaw" and "hemorrhage in the soft tissue of the neck," which he averred "was due to blunt trauma." LeVaughn opined "to a reasonable degree of medical certainty" that Parson's cause of death

---

[3] The surveillance video, however, does not show that Joyce went outside during the incident between Wright and Parson in front of the store.

was "multiple blunt traumatic injuries" due to homicide. He explained that although the external injuries were consistent with the "historical information" that she jumped from the truck, "the internal crushing injuries were not consistent with that. Something else happened to her."

¶11. Jeremy Arendale, a criminal investigator with GPD at that time, obtained the search warrant for Wright's cell phone. Messages between Wright and Parson from three months prior were submitted into evidence. After viewing the messages, Arendale concluded that the couple's relationship was "[v]ery toxic, threatening . . . where he was threatening to her a lot to actually kill her."

¶12. The defense called Wright's family members to testify. Brianna Wright, his sister, testified that on one occasion, Parson "had an attitude and was mad, and next thing I know, like, she just opened the door while we was driving." She said that the couple would fight "verbally," but she never saw them get physical.

¶13. Hoskins testified that when they all left the store, the couple was "just talking." She acknowledged that Wright then "swung at [Parson]," but she claims "he didn't hit her" because Parson "ducked." Hoskins said that Wright "grabbed [Parson] on the back of her neck, and they went around the truck," at which point "he let her go."

¶14. Hoskins also testified that she asked Parson "was she going to walk home with me, and she said, no, she was going to go with [Wright]." However, Hoskins admitted on cross-examination that this was the first time she had provided that detail; it was not in the

7

statement that she gave to police. She denied that Parson was being taken by Wright, saying that he "[b]arely" had his hands on her. Hoskins agreed with the prosecutor that she had told GPD that Parson would not leave because she was scared. She further admitted that Wright had threatened her (Hoskins) later on the evening of the incident, saying that Hoskins had better hope Parson lives or that he was going to kill Hoskins.

¶15.    The jury returned a guilty verdict against Wright for capital murder. Wright filed a motion for a judgment notwithstanding the verdict (JNOV), or in the alternative, for a new trial on November 9, 2023. In the motion, Wright alleged several errors at trial, including the court's: (i) denial of Wright's motion for a directed verdict; (ii) refusal of certain jury instructions; and (iii) denial of his motion in limine and his motion to suppress the search warrant. On December 7, 2023, the trial court sentenced Wright to life without parole eligibility in the custody of the Mississippi Department of Corrections.

¶16.    On December 19, 2023, Wright filed an amended motion for a JNOV. Although the trial court did not rule on this motion, under Mississippi Rule of Criminal Procedure 25.3, the motion for JNOV was "deemed denied as of the thirtieth day" of pendency.[4] Wright filed a notice of appeal on January 9, 2024.

**Discussion**

---

[4] At the sentencing hearing on December 6, Wright's attorney informed the court that he "did go ahead and file a motion for JNOV." The trial judge said that if the parties did not want a hearing, he "will rule on it."

8

## I.     Sufficiency of the Evidence[5]

¶17.    Wright was charged with "willfully, unlawfully, and feloniously kill[ing] Tymoneshia Parson while he . . . was engaged in the commission of the felony crime of KIDNAPPING as defined in Section 97-3-53 of the Mississippi Code[,]" in violation of Mississippi Code Annotated section 97-3-19(2)(e).  The kidnapping statute provides:

> Any person who, without lawful authority and with or without intent to secretly confine, *shall forcibly seize and confine any other person, or shall inveigle or kidnap any other person with intent to cause such person to be confined or imprisoned against his or her will*, . . . upon conviction, shall be imprisoned for life in the custody of the Department of Corrections if the punishment is so fixed by the jury in its verdict.  If the jury fails to agree on fixing the penalty at imprisonment for life, the court shall fix the penalty at not less than one (1) year nor more than thirty (30) years in the custody of the Department of Corrections.
>
> This section shall not be held to repeal, modify or amend any other criminal statute of this state.

Miss. Code Ann. § 97-3-53 (emphasis added).  "The prosecution is required to prove each element of the underlying kidnapping offense beyond a reasonable doubt in order for the capital murder conviction to stand."  *Underwood v. State*, 708 So. 2d 18, 35 (¶49) (Miss. 1998).

¶18.    At trial, defense counsel contended "that the State ha[d] not met [its] burden of proof to demonstrate" that Wright either "forced" Parson into the vehicle (kidnapping) or that he forced Parson "out of that vehicle" (murder).  Although the State acknowledged that Parson

---

[5] We have combined Issues I and II from the appellant's brief, as well as Issues III and IV.

9

got into the truck after Wright had walked back around to the driver's side door, the prosecution argued that a victim's alleged consent to a kidnapping is not a defense if "such alleged or claimed consent was the result of duress." Specifically, the prosecutor asserted:

> But at that point, she had been threatened with deadly harm, threatened with being killed, and seconds before had been actually pushed out of the store, punched in the back of the head, grabbed by the throat, hit the head on the side of the truck.
>
> . . . .
>
> And I don't believe that there's any question about, at the very least, that that's a question for the jury to decide whether being pushed out of the store, hit in the back of the head, grabbed and dragged around the truck, and then told to get in by the person that just did that to you seconds earlier, that a person would do -- would get in for fear of being harmed further.

The trial judge denied the defense's motion for a directed verdict, finding:

> [T]he Court does believe that because of the history of the relationship between the defendant and the victim in the case that it is a very close call in terms of the evidence that the State has put on as to her lack of consent to get into the vehicle.
>
> I think if it's a stranger and you walk up to a person, put your hand behind their neck and hold them under their arm and push them to a car door—I think that's an easy question of them being kidnapped.
>
> But I guess the question is: If she hadn't jumped out of the car, been pushed out of the car, if she had never died, would it have been a kidnapping, I mean, if she had not?
>
> But I think it's a close call. But taking the evidence in the light most favorable to the nonmoving party, which in this instance is the State, I believe that it's a jury question, and the Court will allow the jury to decide.

Defense counsel renewed the motion at the close of the evidence, which the trial judge again

denied.

¶19. Appealing the court's ruling to deny his motion, Wright reiterates his argument that the State failed to provide sufficient evidence that Parson was kidnapped (i.e., "that he forced Ms. Parson[] into the subject vehicle"). "Motions for a directed verdict challenge the sufficiency of the evidence presented at trial." *Goode v. State*, 374 So. 3d 592, 603 (¶26) (Miss. Ct. App. 2023) (citing *Lacey v. State*, 310 So. 3d 1206, 1214 (¶18) (Miss. Ct. App. 2020)). We review the trial court's "denial of a motion for a directed verdict de novo because it is a challenge to the legal sufficiency of the evidence," which is "viewed in a light most favorable to the State." *Id*. at 603-04 (¶¶26-27). "[T]he relevant question is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id*. at 604 (¶26) (quoting *Dampeer v. State*, 989 So. 2d 462, 464 (¶6) (Miss. Ct. App. 2008)).

¶20. With regard to Wright's behavior leading up to Parson's entering the truck, the supreme court has "held that circumstantial evidence . . . [is] sufficient to show involuntary accompaniment and service against one's will." *Williams v. State*, 544 So. 2d 782, 789 (Miss. 1987) (citing *Neal v. State*, 451 So. 2d 743, 758 (Miss. 1984)). As in the present case, the defendant in *Williams* argued that the State "failed to prove the underlying felony of kidnapping." *Id*. at 788. The supreme court noted that the victim, who was intoxicated, "was never com[m]andeered against her will in the truck" and "was a willing participant until the fourth attempted sex act, at which point she began her protest." *Id*. at 790. The *Williams*

11

Court concluded, "[I]t is conceivable that a reasonable juror could have found that [the victim] was inveigled, i.e., enticed or tricked, with intent to secretly confine her against her will." *Id*. "The fact that the confinement is minor is of no consequence so long as it is present[.]" *Id*.

¶21.    Here, the Kingdoms testified that Wright was angry and "belligerent" when he came into the store. The video showed Wright punch Parson, grab her around the neck, and force her to walk around to the passenger's side of the truck. The State presented evidence of text messages between the couple sent three months prior to the incident that demonstrated a pattern of threats of harm to Parson. Lastly, the medical examiner testified that while Parson did have abrasions that suggested she fell from the truck, she also had a jaw fracture and hemorrhaging in her neck "due to blunt trauma."

¶22.    In its appellee's brief, the State also noted that the jury was instructed "that the alleged consent of the victim to a kidnapping is not a defense if you find, beyond a reasonable doubt, that such consent was the result of threat or duress" in Jury Instruction S-8. Defense counsel did not object to the giving of this instruction. This language in Jury Instruction S-8 is similar to language from a (non-capital offense) kidnapping statute repealed in 1980.[6] Former Mississippi Code Annotated section 97-3-51 (1972) provided:

> Every person who shall, without lawful authority, forcibly seize and confine

---

[6] The current version of section 97-3-51 concerns the unlawful interstate removal of a child under the age of fourteen by a non-custodial parent or relative. *See* Miss. Code Ann. § 97-3-51 (Rev. 2020).

any other, or shall inveigle or kidnap any other with intent to cause such person to be secretly confined or imprisoned in the state against his will, or to cause such other person to be sent out of this state against his will, or to cause such other person to be deprived of his liberty, or in any way held to service against his will, shall upon conviction, be punished by imprisonment in the penitentiary not exceeding ten years. *Upon the trial of any such offense the consent of the person so kidnapped or confined shall not be a defense, unless it appear that such consent was not extorted by threats or duress.*

Miss. Code Ann. § 97-3-51 (emphasis added).[7] Furthermore, many of the cases cited by the State during the directed-verdict motion discussion were decided prior to this statute's repeal and merely cited section 97-3-51 without discussion of the consent issue.[8] We therefore asked the parties for additional briefing to address whether the repeal of section 97-3-51 impacts the trial court's ruling on the directed verdict and/or the giving of Jury Instruction S-8.

¶23. Unsurprisingly, Wright now argues that the trial court erred in giving this instruction

---

[7] *Repealed by* 1980 Miss. Laws ch. 394, § 1 (S.B. 2416), effective from and after April 28, 1980.

[8] Some of the cases cite the pre-1972 version of the statute. *See* Miss. Code (1942) § 2237; Miss. Code (1906) § 1249; Hemingway's Code (1917) § 979. These prior versions also include the language in 97-3-51 italicized above. In *Brooks v. State*, 236 So. 2d 751, 754 (Miss. 1970), the supreme court explained that this statute "was enacted at least as far back as 1848 and apparently the legislative intent was to prohibit white slavery or the kidnapping and transportation of women in intra and interstate prostitution." There were two kidnapping statutes prior to the repeal of 97-3-51; that section carried a maximum penalty of ten years imprisonment. Miss. Code Ann. § 97-3-51 (1972). The other, section 97-3-53, carried a maximum penalty of life imprisonment "if the punishment is so fixed by the jury" or, if the jury fails to agree on life imprisonment, "the court shall fix the penalty at not less than one (1) year nor more than thirty (30) years." Miss. Code Ann. § 97-3-53 (Supp. 1974). The latter statute and its penalty were retained. Miss. Code Ann. § 97-3-53 (Rev. 2020).

13

because it relied upon a repealed statute and was not supported by the evidence. Since the defense did not object to the instruction at trial, we may only consider this argument under a plain-error analysis. "For the plain-error doctrine to apply, there must have been an error that resulted in a manifest miscarriage of justice or seriously affects the fairness, integrity or public reputation of judicial proceedings." *Rodgers v. State*, 166 So. 3d 537, 544 (¶15) (Miss. Ct. App. 2014) (quoting *Conners v. State*, 92 So. 3d 676, 682 (¶15) (Miss. 2012)). If the instructions, when "read as a whole[,] . . . fairly announce the law of the case and create no injustice, no reversible error will be found." *Id*. at (¶16).

¶24.    First, we find the State's assertion that "section 97-3-51 was repealed to alleviate the confusion of having two kidnapping statutes—not because of anything problematic in any portion of that statute's language"—to be a reasonable interpretation of the legislative action. In *White v. State*, 374 So. 2d 225, 227 (Miss. 1979), the supreme court "suggest[ed] that the legislature should repeal one of the statutes, retain the other, and prescribe such penalty as in its wisdom it deems justified for the punishment of the crime of kidnapping."

¶25.    Second, although the retained statute, section 97-3-53, does not contain the specific terms "consent" or "duress," we agree with the State's reasoning that section 97-3-53's definition—that a kidnapping occurs when a person "kidnap[s] any other person with intent to cause such person to be confined or imprisoned *against his or her will*," *see* Miss. Code Ann. § 97-3-53—"continues to reach and prohibit that very conduct." "Where a person is coerced by illegal force *or the threat of force*, it is obvious that the taking or detention is

14

against his wishes." B. Fingood, Annotation, *Kidnapping by Fraud or False Pretenses*, 95 A.L.R.2d 450, § 1[a] (1964) (emphasis added).

¶26. In *Graham v. State*, 185 So. 3d 992, 1003-04 (¶¶32-34) (Miss. 2016), the supreme court rejected a defendant's argument that there was insufficient evidence to support a kidnapping conviction because the sexual-assault victim did not fight back, nor was she told she was not free to leave. Section 97-3-53 "does not require that a victim must attempt to flee or that she be told that she cannot leave for a kidnapping to arise." *Id.* at 1003 (¶33). We conclude that the giving of Jury Instruction S-8 did not "result[] in a manifest miscarriage of justice or seriously affect[] the fairness, integrity or public reputation of judicial proceedings." *Rodgers*, 166 So. 3d at 544 (¶15). While the exact language of the jury instruction is no longer codified in section 97-3-51, imprisonment "against his or her will" addresses the same or similar conduct.

¶27. In sum, we find that the evidence was sufficient to support the conviction of capital murder, including the underlying felony of kidnapping, and that the giving of the jury instruction was not plain error.

## II. Denial of Wright's Motion in Limine and Motion to Suppress and for Other Relief

¶28. Prior to trial, Wright's counsel filed a motion in limine and motion to suppress the text messages obtained from Wright's cell phone. The sole basis for Wright's argument in the motion to suppress was that the search warrant failed to "contain a properly executed 'return.'" The trial court denied Wright's motion to suppress, holding, "Case law is clear that

executing the return of a search warrant is a ministerial act." (Citing *Wince v. State*, 206 Miss. 189, 199-200, 39 So. 2d 882, 884 (1949)). Wright has not raised any argument on appeal regarding the sufficiency of the warrant; nor has he argued the admissibility of this evidence in the motion to suppress. We therefore find any claim of error regarding the trial court's denial of the motion to suppress is barred for purposes of appellate review. *See Fluker v. State*, 17 So. 3d 181, 183 (¶4) (Miss. Ct. App. 2009) (holding that issues raised before the trial court that are not argued on appeal are deemed abandoned).

¶29. With regard to Wright's motion in limine, the trial court found "that the messages are admissible to show malice, premeditation, and intent" and that "after performing the balancing test as required in Rule 403 of the Mississippi Rules of Evidence, . . . the messages are more probative than prejudicial."[9] Wright appeals the trial court's findings, contending that the admission of this evidence "violated the applicable provisions of Rule 404(b) of the Mississippi Rules of Evidence."

¶30. A court's ruling on a motion in limine is reviewed for abuse of discretion. *Goodson*, 408 So. 3d at 653 (¶9). Rule 404(b)(2) of the Mississippi Rules of Evidence provides that evidence of other crimes, wrongs, or bad acts may be admitted to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." "The purposes listed in Rule 404(b) are not exhaustive; they simply are examples of noncharacter

---

[9] When Arendale testified regarding the text messages he retrieved from Wright's phone, defense counsel noted the court's ruling on the motions but still made his objection for the record.

purposes for which evidence of other crimes, wrongs, or acts may be admitted." *Blackwell v. State*, 273 So. 3d 801, 809 (¶24) (Miss. Ct. App. 2019) (quoting *Boggs v. State*, 188 So. 3d 515, 519 (¶11) (Miss. 2016)).

¶31.    Wright acknowledges that the State "offered the electronic communication between [him] and Ms. Parson as 'intent,' 'motive,' and 'preparation.'" He nevertheless contends that the introduction of this evidence "violated the applicable provisions of Rule 404(b)" and failed the "prejudice test" articulated in Rule 403.

¶32.    We disagree and find no abuse of discretion in the trial court's ruling to deny the motion in limine.  In *Moates v. State*, 379 So. 3d 928, 937-38 (¶¶41-44) (Miss. Ct. App. 2024), we considered a similar argument by a defendant who was convicted of murdering his ex-wife's boyfriend.   Richard Moates asserted that the trial court erred in allowing a witness's testimony that the defendant had threatened her and Moates's ex-wife, Cortney, shortly before the killing of the victim.  The trial court found the testimony "was probative of [the defendant's] 'state of mind' and 'the status of the relationship' between" Moates and the victim.  *Id*. at 938 (¶44).  We agreed, holding:

> Rather, the evidence showed a continued pattern of violence toward Cortney and those she cared about.  This evidence is probative because it shows Moates acted intentionally and not in the heat of passion when he came to Cortney's home, broke in, threatened Cortney if she told anyone about the incident, and then shot and killed [the victim].  In short, as the trial court found, the evidence was probative of Moates's state of mind, as well as the status of their relationship.

We further concluded that "although the trial court did not make a detailed, on-the-record

17

Rule 403 analysis, it is apparent that the court 'filtered' the proffered evidence through the Rule 403 balancing test." *Id*. at 939 (¶51).

¶33. Likewise, in the present case, the State argued to the trial court "that any prejudicial effect does not substantially outweigh the probative value. . . . So we don't believe that the 403 analysis would render them inadmissible either." The trial court stated in its order that it had "perform[ed] the balancing test as required in Rule 403" and found "that the messages [were] more probative than prejudicial." *See* MRE 403 (stating that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice"). Therefore, the trial court properly filtered this evidence through the Rule 403 balancing test, and we find no error.

## Conclusion

¶34. Finding no reversible error in the trial court's rulings, we affirm Wright's conviction and sentence.

¶35. **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.**